[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 23, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-10209

_____

Agency Nos. A79-342-397
A79-098-167

OSCAR MARINO CARDONA RIVERA,
MARTHA ISABEL VILLEGAS AGUDELO,
DIEGO FERNANDO CARDONA VILLEGAS,
MONICA ISABEL CARDONA VILLEGAS,
ANDRES MAURICIO CARDONA VILLEGAS,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 23, 2007)**

Before PRYOR, KRAVITCH and ALARCON,* Circuit Judges.

_____

  * Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

PRYOR, Circuit Judge:

This appeal requires us to determine whether applicants for asylum and withholding of removal are persecuted "on account of" their political opinion when their persecutors have murdered members of their family of business owners for their refusal to pay a "war tax" to a Marxist paramilitary organization, the Sixth Front of the Revolutionary Armed Forces of Colombia (FARC). Oscar Marino Cardona Rivera and his wife and three children seek review of a decision of the Board of Immigration Appeals that affirmed the denial of their applications for asylum and withholding of removal. Because the record does not compel the conclusion that the petitioners' fear of persecution is on account of their political opinion, we deny the petitions.

## I. BACKGROUND

The petitioners are all natives and citizens of Colombia. During the events described in their application for asylum, they lived in Tulua, several hours east of Bogota. Cardona Rivera's father was a prosperous businessman in Tulua, where he owned a business providing glass for construction work. Cardona Rivera's father was also politically active and supported the Liberal Party by distributing fliers, putting up billboards, donating money to the Party, and attending events and meetings. Like his father, Cardona Rivera supported the Liberal Party by distributing fliers and lending vehicles for Party activities.

2

In January 1996, a member of the Sixth Front of FARC called Cardona Rivera's father and demanded that he pay a "war tax" of 100 million Colombian pesos. The caller informed Cardona Rivera's father that his responsibility for the war tax was "based on his economical condition" and he would be murdered if he refused to pay. Cardona Rivera's father continued to receive calls demanding the tax in 1997 and 1998, but Cardona Rivera's father always refused to pay. In February 1998, Cardona Rivera's father told his family that he would not pay the FARC "a solitary peso . . . because they were a subversive group that was against the government and against all his principles."

On June 24, 1998, while working at the family's glass business, Cardona Rivera's father and younger brother were shot and killed by guerrillas. Cardona Rivera heard the shots from an adjacent building. Cardona Rivera confronted the killers who pointed a gun at him as they fled the scene. Cardona Rivera and his remaining brothers took over their family business, and Cardona Rivera's mother began receiving telephone calls from members of the FARC, who claimed responsibility for her husband's murder and threatened that more murders would follow unless the family paid its outstanding war tax.

On July 20, 1999, Cardona Rivera's family gathered at the ranch of one of his brothers to discuss the family's response to the FARC when a bomb exploded at the entrance of the home and destroyed its door and blew out its windows. The

3

next day, the FARC called Cardona Rivera at the family business to declare responsibility for the bombing. The FARC said that the bombing had been the family's last warning and demanded the war tax.

Cardona Rivera and his brother fled Tulua and made arrangements to come to the United States. After Cardona Rivera fled Tulua, one of his other brothers, Victor Hugo, began receiving phone calls demanding the war tax. Cardona Rivera's wife and children also began receiving threatening phone calls at the family business. In March 2001, Cardona Rivera's wife and children fled to the United States and were charged with removability for lack of valid entry documents. In August 2001, the Immigration and Naturalization Service also charged Cardona Rivera with removability for remaining in the United States for a time longer than permitted.

Cardona Rivera and his family filed for asylum and withholding of removal based on the same events in Colombia, and the cases were consolidated. In addition to the family's testimony about the events leading up to their flight to the United States, the petitioners presented evidence about the operations of the FARC in Colombia. Cardona Rivera testified that the majority of businessmen in Colombia are threatened and that he would be persecuted if returned to Colombia because he owes the war tax. Cardona Rivera also testified that, although he did not hold a position with the Liberal Party, he thought he was targeted to pay the

4

war tax based on his family's monetary support for the Liberal Party. Dr. Luz Stella Nagle, a former Colombian judge, testified that the political mission of the FARC is to attack small business owners to undermine the economy and government. She explained that any politically active Colombian is considered a threat to the FARC but that, if an individual pays a war tax, that person would be viewed by the FARC as "a supporter and one of their friends."

The petitioners presented two articles about the practice of the FARC of extorting money from middle and upper-class businessmen. A January 3, 2000, article explained that "[t]he principle aim of most . . . extortion operations is to raise revenue" and that the FARC has "vowed to make the country's middle and upper class feel the pain of protracted conflict whose principal victims have long been civilians in rural areas." Both articles explained that the FARC employs a sophisticated process for gaining information on the wealth of their prospective extortion targets and that the rate of extortion increased in 1999.

Other documentary evidence corroborated that this method of extortion is common. The United Kingdom 2003 Country Report and the 2003 U.S. Department of State Country Report state that the FARC targets small and medium-sized business owners for extortion. The country reports also explain that the FARC persecutes and assassinates political leaders and government officials.

The Immigration Judge denied the applications for asylum and withholding of removal. The Immigration Judge found the petitioners to be credible and determined that the FARC was behind the threats and murders against their family but concluded that these incidents did not "lay a basis for past persecution" on account of political opinion. The Immigration Judge found that neither Cardona Rivera nor any of his family members held positions in the Liberal Party or the Colombian government. The Immigration Judge reasoned that, had the FARC targeted the petitioners for persecution on account of their political opinion, the FARC would have attempted to harm or kill them instead of threatening harm or death if they did not pay the tax. The Immigration Judge found it especially relevant that the FARC killed Cardona Rivera's father several years after he first refused to pay the tax and had never attempted to kill or harm the petitioners. The Immigration Judge found that the behavior of the FARC was more consistent with its pattern of criminally motivated extortion than political persecution. The Board affirmed without opinion.

## II. STANDARDS OF REVIEW

When the Board adopts the Immigration Judge's decision without opinion, we review only the decision of the Immigration Judge. Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006). To the extent the Immigration Judge's decision is based on a legal determination, we review it de novo. Mohammed v.

Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). "This court reviews administrative fact findings under the highly deferential substantial evidence test." Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). We "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (internal quotation marks omitted). "Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi, 386 F.3d at 1027. "In sum, findings of fact made by administrative agencies, such as the BIA, may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

### III. DISCUSSION

Cardona Rivera and his family petition for review of the denial of their applications for both asylum and withholding of removal. There are separate but related standards for evaluating requests for these two forms of relief. The denial of an application for asylum ordinarily requires the denial of an application for withholding of removal.

7

Under the Immigration and Naturalization Act, the Attorney General may grant asylum if an alien meets the statutory definition of a "refugee." See 8 U.S.C. § 1158(b)(1)(A). A "refugee" is "any person who is outside any country of such person's nationality" who is unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). To prove their status as refugees, the petitioners must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a "well-founded fear" of future persecution on account of a protected ground. 8 C.F.R. § 208.13(b). "An imputed political opinion, whether correctly or incorrectly attributed, may constitute a ground for a well-founded fear of political persecution within the meaning of the INA." Al Najjar, 257 F.3d at 1289 (internal quotation marks and citations omitted).

To be entitled to withholding of removal, the petitioners must meet a higher evidentiary threshold than the "well-founded fear" standard for asylum. The petitioners must establish that they would "more likely than not" be persecuted on account of a protected ground if returned to Colombia. Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002). "If an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]." Nkacoang v. INS, 83 F.3d 353, 355

(11th Cir. 1996); see also Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1324 n.2 (11th Cir. 2001).

The petitioners argue that the record of their family's experiences in Colombia compels the conclusion that the FARC would persecute them upon their return and compels the conclusion that the persecution would be on account of their actual or imputed political opinion. We assume, without deciding, that the petitioners' experiences in Colombia prove that they have a well-founded fear of persecution upon their return. Even with that assumption, we conclude that the record does not compel the finding that the petitioners either were persecuted or have a well-founded fear of future persecution on account of political opinion.

There is no dispute that the FARC persecuted the petitioners, at least in part, because they were wealthy and refused to pay the tax; therefore, their applications for asylum and withholding of removal are predicated on a "mixed motive" theory. This Court has held that an applicant is entitled to withholding of removal "[i]f [he] can show that persecution was, at least in part, motivated by a protected ground." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). Because the burden of proof to establish eligibility for asylum is lower than the burden of proof to establish a right to withholding of removal, it follows that mixed-motive persecution establishes eligibility for asylum as well. See De Brenner v. Ashcroft,

9

388 F.3d 629, 636 (8th Cir. 2004); Borja v. INS, 175 F.3d 732, 735-36 (9th Cir. 1999) (en banc); Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir. 1994). So long as an applicant for asylum proves with specific and credible evidence he or she has a well-founded fear of persecution on account of a protected ground, it matters not that his or her persecutors may have additional motives for their actions. See In re S–P–, 21 I. & N. Dec. 486, 490 (BIA 1996) (in a mixed-motive case, "the applicant [must] produce[] evidence from which it is reasonable to believe that the harm was motivated by a protected ground").

The issue before us is whether the record compels a finding that at least one motivation of the alleged persecutors involved a protected ground. The petitioners employ two theories to establish a nexus between their fear of persecution by the FARC and their actual or imputed political opinion. Neither theory is persuasive.

The petitioners first argue that the record compels the finding that their family was targeted for the war tax, in part, based on their support for the Liberal Party, but the contrary finding of the Immigration Judge is supported by substantial evidence. The country reports and articles in the record detail political assassinations and kidnappings but explain that extortions are primarily a method of raising revenue and a tactic to undermine the legitimacy of the Colombian government. The country reports and articles also establish that the FARC employs sophisticated techniques to identify extortion targets based on their ability

10

to pay, but the FARC assassinates, kidnaps, or assaults political enemies. Dr. Nagle also testified that the FARC selects targets based on their income, not their politics.

The record does not compel the conclusion that the FARC varied from its usual practices. The FARC never demanded that Cardona Rivera cease any political activities, never accused Cardona Rivera of being a government operative, and never demanded that his family cease involvement in the Liberal Party. Cardona Rivera did not occupy a post in either the Liberal Party or the government. Although Cardona Rivera wrote in his application that "the FARC told [my father] that in the same way that we collaborated with the Liberal Party we had to collaborate with them," the Immigration Judge reasonably surmised that, in context, Cardona Rivera made this statement to explain that the war tax was not voluntary. The record does not compel the conclusion that the FARC targeted Cardona Rivera's father because of his donations to the Liberal Party. Cf. Borja, 175 F.3d at 737 (holding that petitioner was extorted on account of her political opinion when she was targeted for extortion after a "hostile political confrontation with [the guerrillas]").

This record contrasts with the record in De Brenner v. Ashcroft, for example. There the Eighth Circuit reversed the determination of the Board that an asylum applicant who had been extorted by the Shining Path guerrillas in Peru was

11

not persecuted on account of political opinion. 388 F.3d at 639. The court explained that "the Shining Path guerrillas expressly named Ms. De Brenner as a member and supporter of the APRA [a political party], accused her family of supporting the government, and mistakenly singled her out as an actual worker for the APRA (alleging that she was employed as the personal secretary of the Director of the Mineral Bank who was a senior, active member of the APRA)." Id. at 637.

The petitioners next argue that they refused to pay the war tax on account of their family's political opposition to the FARC and this political opposition is sufficient to render the likely persecution of their family "on account of" their political opinion. We disagree. Even if we were to assume that the record compels the finding that Cardona Rivera's father and his family refused to pay the war tax for political reasons, this finding would not establish persecution on account of political opinion. In INS v. Elias-Zacarias, the Supreme Court reasoned that it is not enough for an asylum applicant to prove that he refused to cooperate with guerrillas because of his political opinion. 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). "Even if [the evidence compels the conclusion that the petitioner refused to cooperate with the guerrillas because of his political opinion, the petitioner] still has to establish that the record also compels the conclusion that he has a 'well-founded fear' that the guerrillas will persecute him because of that political

12

opinion, rather than because of his refusal to [cooperate] with them." Id. We also have held that "[i]t is not enough to show that [the petitioner] was or will be persecuted or tortured due to [the petitioner's] refusal to cooperate with the guerillas." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004).

Although Dr. Nagle testified that the FARC imputes a political opinion to any person who refuses to pay a war tax, this statement is unsupported by the country reports. Instead, the country reports support the Immigration Judge's finding that, more often than not, the FARC does not care about a business owner's political opinion. The country reports and newspaper articles explain that business owners, once targeted for taxation, will be harassed until they pay but that even a grudging payment of the war tax ordinarily ends the harassment.

There is substantial evidence to support the Immigration Judge's finding that the motive of the FARC for persecuting the petitioners' family was to raise funds for its war against the Colombian government. Neither Dr. Nagle's testimony nor any other evidence compels the finding that the FARC demanded that the petitioners' family pay a war tax as a political litmus test. The FARC committed violence against the petitioners' family only after they refused to pay the tax for several years, long after the FARC would have imputed a political opinion to Cardona Rivera's father. After the murders of Cardona Rivera's father and brother, the FARC harassed, threatened, and extorted the family solely for the war

13

tax. The FARC did not target the petitioners for assassination or kidnapping as it does its political enemies. "It is quite plausible, indeed likely, that [persecution] would be engaged in by the guerrillas in order to augment their [income] rather than show their displeasure" with the petitioners' political opinion. Elias-Zacarias, 502 U.S. at 483 n.2, 112 S. Ct. at 816 n.2. "Although other inferences about the guerillas' motives may be drawn, it is not our task to do so as long as substantial evidence supports the [Immigration Judge's] conclusion." Perlera-Escobar v. Exec. Off. for Immigration, 894 F.2d 1292, 1299 (11th Cir. 1990). "[E]ven if the evidence could support multiple conclusions, we must affirm the agency's decision." Adefemi, 386 F.3d at 1029.

Based on the foregoing discussion, we must deny the petitions for review of the denial of the petitioners' applications for asylum and withholding of removal. The record does not compel the finding that the petitioners have a credible fear of persecution on account of their actual or imputed political opinions. Because the record does not compel the determination that there is a reasonable probability that the petitioners will be persecuted on account of their political opinion, they also do not meet the greater evidentiary burden for establishing eligibility for withholding of removal. Silva, 448 F.3d at 1243.

## IV.  CONCLUSION

The petitions for review of the decision of the Board of Immigration Appeals are

**DENIED.**