[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13393
Non-Argument Calendar

_____

BIA Nos. A96-087-130 & A96-087-131

FRANCISCO ROBERTO SOLORZANO ALVAREZ,
PATRICIA ESTHER CARRILLO AGUDELO,
JULIANA SOLORZANO CARRILLO,
JUAN PABLO SOLORZANO CARRILLO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 6, 2009)**

Before BIRCH, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

Petitioner Francisco Roberto Solorzano Alvarez ("Solorzano"), his wife,

Patricia Esther Carrillo Agudelo, and their two children, Juliana Solorzano Carrillo

and Juan Pablo Solorzano Carrillo (collectively, "petitioners"), natives and citizens

of Colombia, seek review through counsel of an order by the Board of Immigration

Appeals ("BIA") affirming the Immigration Judge's ("IJ's") denial of petitioners'

claims for asylum and withholding of removal under the Immigration and

Nationality Act ("INA"), and relief under the United Nations Convention Against

Torture and other Cruel, Inhuman or Degrading Treatment or Punishment

("CAT"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c).  Petitioners argue that the

BIA erred in denying their application for asylum because the documentary

evidence and Solorzano's testimony established that Solorzano suffered past

persecution and had a well-founded fear of future persecution on account of his

political opinion.[1]  After careful consideration of the record, we conclude

otherwise.  Accordingly, we DENY the petition for review.

## I. BACKGROUND

In April 2003, petitioners were served with Notices to Appear ("NTA"),

charging that they were natives and citizens of Colombia, that they entered the

---

[1] On appeal, petitioners do not challenge the BIA's decision regarding their entitlement to relief under CAT and so have abandoned this claim.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam) (noting that when a party "fails to offer argument on an issue, that issue is abandoned").

United States on 1 August 2002, and that they were subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B) as nonimmigrants who remained in the United States for a time longer than permitted. Administrative Record ("AR") at 356, 368, 378, 388. Solorzano filed an asylum application, seeking asylum and withholding of removal under the INA based on his political opinion and protection under CAT. He included his wife and two children in his application. Id. at 310-23. Solorzano alleged, inter alia, that he had been the victim of persecution by the Revolutionary Armed Forces of Colombia ("FARC") for his social and political activities. Id. at 321.

Solorzano set out the following specific allegations in his application. In October 2001, he received a letter from the FARC, in which the group demanded a monetary contribution. When he did not comply, he began to receive threatening telephone calls in which the callers ordered him to stop his political and social activities. Id. He received a second letter from the FARC in May 2002, in which the group again demanded monetary support and ordered him to stop his political and social activities. Id. at 322. He also described an incident that occurred on 4 June 2002, in which he and his wife were traveling by car and were stopped at a roadblock by guerrillas. After they were ordered out of the car, an army patrol appeared, and the guerrillas engaged the patrol in a firefight. The guerillas ultimately fled in Solorzano's car. Id. Three days after the incident, Solorzano

3

received another telephone call in which the caller threatened Solorzano with death and told him that he was a "military objective" of the FARC. Id. at 322-23. Shortly after this call, Solorzano moved with his family to the United States. Id. at 323. While in the United States, Solorzano received one last threatening letter in December 2003. Since then, the telephone calls and letters have ceased.

In support of his asylum application, Solorzano submitted the following: (1) letters indicating that Solorzano was a member of the Conservative Party in Colombia and had worked in the campaign for President Alvaro Uribe Velez, id. at 286-91, 292-95; (2) two reports from the Gaula,[2] indicating that Solorzano had received threatening telephone calls and death threats, id. at 112-15; (3) four letters from the FARC, generally demanding monetary support and an end to Solorzano's social and political activities, id. at 118-127, 296-99; and (4) the 2005 U.S. State Department's Country Report on Human Rights Practices in Colombia. Id. at 131-57.

Solorzano received the FARC letters in October 2001, May 2002, August 2003, and again in December 2003. The letters generally asked for a monetary contribution and demanded that Solorzano end his "active association in political

_____

[2] The words "Gaula," "Jaula," and "Gala" appear throughout the record and apparently refer to the same entity. See, e.g., id. at 32, 73, 113. We employ the term "Gaula" for consistency. In removal proceedings, Solorzano testified that the Gaula was a branch of the Colombian army that handled kidnapings and extortion. Id. at 82.

4

and social programs" to which the FARC was opposed. Id. at 121-22. The letters became increasingly threatening, with the last naming Solorzano as a "military target." Id. at 126-27. The letters also suggested that a sizable monetary contribution would "exonerate" him and obviate the necessity of retaliation. Id. at 121-22.

The 2005 U.S. State Department's Country Report on the Human Rights Practices in Colombia indicated, inter alia, that: (1) the conflict between the government and the FARC continued after the 2002 election of President Uribe; (2) the government's respect for human rights continued to improve; (3) serious problems remained; and (4) the majority of the human rights abuses in Colombia were perpetrated by illegal armed groups, such as the FARC. Id. at 131-32. The report also provided that "[p]olitical and unlawful killings remained an extremely serious problem," and FARC guerrillas committed unlawful killings and kidnaped civilians. Id. at 132-33, 142. According to the report, the FARC killed "journalists, religious leaders, candidates for public office and local elected officials and politicians, alleged paramilitary collaborators, and members of the security forces." Id. at 133, 142.

In removal proceedings before the IJ, Donna Eisenberg, a forensic document examiner for the Department of Homeland Security, Immigrations and Customs Enforcement Forensic Document Lab, testified concerning the authenticity of the

FARC letters. Id. at 56, 65, 67. After examining the letters, she could not offer an opinion as to whether they were authentic or not. Id. at 69. However, she was suspicious of the October 2001 letter because the envelope bore a postal cancellation date of 28 July 2000, predating the letter within it by over a year. Id. at 70. She made no finding as to whether the postal cancellation stamp was authentic, but "took it at face value." Id. On cross-examination, she testified that she could not authenticate the Gaula reports and had no experience with Gaula documents. Id. at 73.

Solorzano then testified and essentially recounted the allegations made out in his asylum application. Id. at 75. He used to live in Cali, Colombia, where he has owned a "plastic enterprise" for over seventeen years. Id. at 76-77. As for his political activities, he had been a member of the Conservative Party since 1993. Id. at 78. His role in the party was limited to offering financial assistance through his business. He also supported educational programs for children and training for adults to help them find work. Id. at 78-79. In 2001, he decided to support Uribe[3] for president, and he worked in Uribe's campaign. Id. at 83-84. Solorzano also described the four FARC letters and the roadblock incident in some detail. Id. at 81-89. He concluded his testimony by stating that he feared for his life and that of his family if returned to Colombia. On cross-examination, Solorzano conceded

---

[3] The transcript provides that this name is "Ariva," but it appears that it should be "Uribe."

6

that neither he nor his business had received any threats since the December 2003 letter and that he did not hold a particular position in his political party, his support for the Conservative Party being primarily through his business. Id. at 102-04.

The IJ denied Solorzano's application for asylum, withholding of removal, and request for relief under CAT, and ordered him and his family removed to Colombia. Id. at 24. Although the IJ found his testimony to be credible, he concluded that Solorzano's description of his political activities was "not very detailed" and that there was no evidence that he held an important position or did anything to make him a target for anyone in Colombia. Id. at 31. Accordingly, the IJ found that the letters were attempts to extort money from Solorzano and that criminal extortion did not constitute persecution.[4] Id. at 32. With respect to the roadblock incident, the IJ determined that there was no indication that the roadblock was specifically established to catch Solorzano. The IJ noted that Solorzano testified that the guerillas manning the roadblock did not know who Solorzano was when he was stopped. Id. The IJ also found that there was no indication that anyone was still seeking to cause harm to Solorzano or his family, given that his business was still operating in Colombia and that he had not been

---

[4] The IJ also cited Solorzano's testimony regarding the Guala's response when he presented them with the FARC letters – namely, that the letters were a common fund raising scheme amongst the FARC guerillas and other groups. Many letters would be sent out indiscriminately with the hope that at least a few recipients would accede to their demands. Id. at 32.

threatened in any form since December 2003. Id. at 33-34. Solorzano appealed

the IJ's decision and argued that his claim was based on the FARC's mixed

motives, one of which was Solorzano's political opinion. Id. at 6-11.

The BIA dismissed the appeal. Id. at 2-4. The BIA agreed with the IJ that

the FARC's singular goal was to obtain money from Solorzano. The BIA

concluded that Solorzano's ownership of a successful business made him a target

for extortion by the FARC and that such extortion was not linked to any statutorily

protected ground for asylum purposes. Because Solorzano failed to establish

eligibility for asylum, the BIA concluded that he also failed to qualify for

withholding of removal. Id. The BIA also noted that Solorzano did not challenge

the IJ's finding with respect to protection under CAT. Id. at 2 n.1.

Solorzano and his family now petition us for review of the BIA's decision.

He argues that the FARC had mixed motives for persecuting him and his family –

he was targeted not only for his money, but also because of his political opinion.

Accordingly, Solorzano contends that he has sufficiently established past

persecution on account of his political opinion and a well-founded fear of future

persecution.

## II. DISCUSSION

We review only the BIA's decision, but where the BIA expressly adopts the

IJ's decision, we also review the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d

8

1262, 1284 (11th Cir. 2001). To the extent that the BIA adopts the IJ's reasoning, we review the IJ's decision as well. Id. When reviewing the IJ and BIA's factual determinations, we employ the substantial evidence test and will affirm if the decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation marks omitted). Under the substantial evidence test, we can reverse a finding of fact by the IJ or BIA "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). We review the IJ and BIA's legal determinations de novo. Mejia, 498 F.3d at 1256.

An alien who arrives in or is present in the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General or Secretary of the Department of Homeland Security has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality . . ., and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

9

8 U.S.C. § 1101(a)(42)(A).  The asylum applicant bears the burden of proving that he or she qualifies as a "refugee."  8 C.F.R. § 208.13(a).  In order to meet this burden, "the applicant must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground."  Mejia, 498 F.3d at 1256.

"Persecution" is not defined in the INA, but we have described it as "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation."  Sepulveda, 401 F.3d at 1231 (quotations marks omitted).  We have also noted that "mere harassment does not amount to persecution."  Id. (quotation and alteration omitted).  In determining whether an alien has suffered past persecution, the BIA considers the cumulative impact of the alleged incidents of persecution.  Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861-62 (11th Cir. 2007) (per curiam).

"An applicant who has demonstrated past persecution is presumed to have a well-founded fear of future persecution."  Mejia, 498 F.3d at 1257; 8 C.F.R. § 208.13(b)(1).  The presumption can be rebutted by a showing that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or the "applicant could avoid future persecution

10

by relocating to another part of the applicant's country of nationality." 8 C.F.R. § 208.13(b)(1)(i).

To establish a well-founded fear of future persecution, an alien "need only show that there is a reasonable possibility of suffering such persecution if he or she were to return to that country." Mejia, 498 F.3d at 1256 (quotation marks and alteration omitted). The alien must establish a fear that is both "subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." Id. "[T]he objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation marks omitted). An alien must establish a nexus between a statutorily protected ground and the feared persecution and can do so by presenting "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" such ground. Sepulveda, 401 F.3d at 1231 (quotation marks omitted). An alien does not have to prove he or she would be singled out if he or she can establish a pattern or practice of persecution of a group of which he or she is a member. 8 C.F.R. § 208.13(b)(2)(iii). If the applicant makes an initial showing of a fear of future persecution, "the government may rebut the applicant's evidence by demonstrating, based upon a preponderance of the evidence, that the applicant could avoid future persecution by relocating

11

within the country if, under all the circumstances, it would be reasonable to expect the applicant to do so." De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1008 (11th Cir. 2008) (quotation marks omitted).

An applicant can establish eligibility for asylum under a mixed-motive theory if the applicant can establish that "persecution was, at least in part, motivated by a protected ground." Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821 (11th Cir. 2007) (quotation marks omitted). "So long as an applicant for asylum proves with specific and credible evidence he or she has a well-founded fear of persecution on account of a protected ground, it matters not that his or her persecutors may have additional motives for their actions." Id.

To qualify for withholding of removal, an alien must show that it is more likely than not that if returned to his or her country, the alien's life or freedom would be threatened on account of a statutorily protected ground. See INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); Al Najjar, 257 F.3d at 1303. A failure to meet the lower burden for asylum necessarily amounts to a failure to meet the more stringent burden for withholding of removal. See Sepulveda, 401 F.3d at 1232-33.

A. Past Persecution

Solorzano argues that the following evidence supports his claim of past persecution: (1) the letters that he received from the FARC; (2) the roadblock incident; and (3) the telephone call informing Solorzano that he was a military

12

target of the FARC.  After careful consideration of the record evidence and in light of our precedent in this area, we conclude that the BIA did not err in its determination that Solorzano failed to sufficiently establish past persecution on account of his political opinion.

We first consider the letters and telephone call.  In Sepulveda, we considered an alien who received several menacing telephone calls in which she was threatened with death, and concluded that "the menacing telephone calls and threats . . . do not rise to the level of past persecution."  401 F.3d at 1231. Moreover, the letters and phone calls received by Solorzano generally demanded money and threatened retaliation should that money not be forthcoming. Solorzano refused to pay and the letters and telephone calls continued, each a bit more menacing than the last.  We have held that "[e]ven if the evidence compels the conclusion that the petitioner refused to cooperate with the guerillas because of his political opinion, the petitioner still has to establish that the record also compels the conclusion that he has a well-founded fear that the guerillas will persecute him because of that political opinion, rather than because of his refusal to cooperate with them."  Rivera, 487 F.3d at 822 (quotation marks and alterations omitted). Although the letters and phone calls did exhort Solorzano to cease his political activities, substantial evidence supports the BIA's conclusion that the guerillas' motives were primarily financial.  Specifically, we note Solorzano's testimony that

13

the Guala told him that indiscriminately threatening prosperous businessmen was a common fund raising scheme employed by the FARC. Accordingly, the record does not compel the finding that the FARC specifically targeted Solorzano because of his political opinion. See id. at 823 ("Although other inferences about the guerillas' motives may be drawn, it is not our task to do so as long as substantial evidence supports the Immigration Judge's conclusion.") (quotation marks and alteration omitted).

With respect to the road block incident, Solorzano provides no evidence that he was a target of the road block or that he and his wife were anything but bystanders in the ensuing firefight between the guerillas and the army patrol that later arrived on the scene. Indeed, Solorzano testified that the guerillas at the road block did not know who he was upon his arrival and that neither he nor his wife were ever specifically targeted during the shootout. Although we do not doubt the terrifying nature of such an incident, the record does not compel the conclusion that the guerillas' actions were in any way tied to Solorzano's political opinion.

B. Fear of Future Persecution

Because substantial evidence supports the IJ's and BIA's finding that Solorzano did not suffer past persecution, he was not entitled to a presumption that he had a well-founded fear of future persecution if returned to Colombia. See 8 C.F.R. § 208.13(b)(1). The IJ and the BIA determined that Solorzano did not have

14

an objectively reasonable fear of future persecution based on the absence of any threats from the FARC since December 2003. The IJ and the BIA also pointed out that Solorzano's business enterprise in Colombia has remained in operation since his departure, apparently unmolested by the FARC. Given the IJ and BIA's reliance on substantial evidence in support of their finding that Solorzano did not have an objectively reasonable fear of future persecution and the lack of any record evidence suggesting that Solorzano or his family would be singled out for persecution on account of his political opinion if returned to Colombia, we would be hard pressed to find error in the BIA's determination. In light of Solorzano and his family's experiences in Columbia, we certainly credit them with a well-founded, subjective fear of future persecution. But the law requires more. As we noted in Rivera, "[w]e assume, without deciding, that the petitioners' experiences in Columbia prove that they have a well-founded fear of persecution upon their return . . . [but] [e]ven with that assumption, we conclude that the record does not compel the finding that the petitioners either were persecuted or have a well-founded fear of future persecution on account of political opinion." Rivera, 487 F.3d at 821. Because Solorzano and his family failed to establish past persecution or a well-founded fear of future persecution on account of political opinion, we further conclude that they do not meet the more stringent standard for withholding of removal.

15

### III. CONCLUSION

Petitioners seek review of an order by the BIA affirming the IJ's denial of their claims for asylum and withholding of removal under the INA and relief under the CAT. Under our highly deferential standard of review, we conclude that the BIA's determination is supported by substantial evidence. Accordingly, we DENY the petition.