[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14011
Non-Argument Calendar

_____

Agency Nos. A95-263-894, A95-263-895

SANDRO GINO ZAGO,
SILVIA LUANA ZAGO,
ANDREA CAROLINA ZAGO,
ALESSANDRA STEPHANIA ZAGO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 24, 2009)

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Sandro Gino Zago and his family, natives and citizens of Peru, petition this Court for review of the decision of the Board of Immigration Appeals that denied Zago's motion to reconsider. Because the Board did not abuse its discretion in denying Zago's motion, we deny the petition for review.

## I. BACKGROUND

Zago, his wife, Silvia Luana Zago, and his two daughters, Andrea Carolina Zago and Alessandra Stephania Zago, were admitted to the United States as nonimmigrant visitors. In March 2002, Zago, on behalf of himself, his wife, and their minor daughters, filed a timely application for asylum and withholding of removal under the Immigration and Nationality Act and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Zago and his family sought relief based on their membership in a particular social group. Zago marked on his application that he had never belonged to or associated with a political party or other organization in Peru.

Zago alleged in his application that he owned three bakeries in Lima, Peru, and was a upper middle class businessman. In 2000, a Peruvian terrorist group, Shining Path, left a letter at one of Zago's bakeries that contained papers mapping a route to his house, the floor plan of his daughters' private school, and routes to locations that his family frequented. The letter demanded that Zago pay Shining Path $50,000 and $900 monthly to assist their "armed fig[ht]." Zago reported the

2

letter to the police, who advised him to hire private security. After Zago received additional letters and several threats in telephone calls and he and his wife were followed by suspicious vehicles, Zago hired three security guards.

Zago attached to his application four documents that supported his allegations: (1) a declaration from his mother, stating that the family left Peru because they were "constantly intimidated" and she "felt that their lives ran danger"; (2) a police report about its investigation of the threats; (3) a personal statement from Zago reciting the incidents that led his family to leave Peru; and (4) a declaration from Arnoldo Manuel Avila Espinoza, one of Zago's private security officers, that stated the officers had to protect the Zago family on two occasions. None of the documents referred to any political activity by Zago. The police report stated that the first letter from Shining Path said it was exacting money from Zago as the "product of the share of war . . . for the maintenance of [its] armed fight[,]" and the failure to pay the money would lead to the "execution of a judgment of war against the traitors of the cause" and end with "execution of the informer and that of [his] family." The report concluded that Zago had been targeted because he was a wealthy businessman and recommended that the police "detect" and "counteract" the threats that would be "guarantee[d]" to "all citizen requests[.]"

Zago also attached a written judgment by a Peruvian court entered on November 27, 2002, against three defendants for "the crimes of Terrorism,

3

Kidnapping and Blackmail" in violation of Peruvian criminal law. The judgment stated that the defendants were members of Shining Path and "blackmailed and kidnapped many people . . . in order to collect funds for their organization for subsequent resurgence." The judgment recited the attempted kidnapping of Zago and his wife, the subsequent investigation that led to the apprehension of the three defendants, and the admission by the defendants that they targeted "different businessmen in the city" to "collect[] funds to satisfy their financial needs[.]"

Before his evidentiary hearing, Zago submitted three other documents to support his application: a report submitted by the intelligence service to the Department of the Interior of Peru, four police reports, and a personal statement. The report of the intelligence service discussed the first extortion letter received by Zago and concluded that Zago had been "selected as part of a businessman group in order to support the Shining Path terrorist armed struggle." The police reports recited language from four letters sent by Shining Path to Zago between late January and early April 2001. The letters stated: "We will kill you for default"; "A war judgment will be executed against traitors"; "The quota payment is demanded"; and "You are demanded to pay for the armed struggle subjection."

In his statement, Zago provided further details about the first letter he received from Shining Path and the events that led Zago and his family to leave Peru. The demand letter stated that Zago "belonged to the oligarchy and so [he]

4

was selected . . . to contribute to the armed fight[.]" Zago alleged that he discussed the matter with friend Walter Garces Gilardi, the Under-chief of Navy Intelligence, who cautioned him that the threat was genuine. Zago stated that he hired private security to protect him and his family, and his personal servants intercepted telephone calls that "made reference to the communist party" and threatened to kill Zago "like a dog" if he did not "contribute to the party and the armed fight." Zago stated that he left Peru for a month, at which point the telephone calls "calmed down," but the callers stated they knew Zago had "left the country and asked if [he] would bring the money." After he returned, a group blocked Zago's route home and returned gunfire from Zago's security guards. When Zago left for the United States, his wife and daughters moved to the home of his wife's sister. Later, as Zago's wife and daughters drove to a family beach house, "two cars with tinted windows tried to block their way," and his wife and daughters escaped when the security guards "use[d] their weapons."

The government submitted a Profile of Asylum Claims from the State Department. The profile estimated that five percent of applications for asylum were filed by individuals who alleged that their "membership in the wealthy business and/or land-owning class puts them at particular risk from the Shining Path . . . terrorist group[]." The profile explained that "[c]areful review of such applications often reveals that the terrorists' motivation in such attacks or

5

mistreatment is aimed at extortion or ransom to finance their activities." The profile recommended that the victims relocate within Peru because "the threat in almost all such cases is localized in nature and the terrorists have little, if any, ability to track victims from one part of the country to another[.]"

At the hearing, Walter Garces Gilardi testified about his conversation with Zago and his recommendation that Zago contact the police. Garces stated that Shining Path threatened Zago because "he had money." When asked if that was the reason Shining Path targeted Zago, Garces responded that Zago "also sold bread to the Navy . . . [a]nd he collaborated with the local police." Garces opined that conditions had worsened in Peru since Zago fled; Zago could not relocate because Shining Path was a countrywide organization; and because Zago was a target of Shining Path, he would be killed if he returned to Peru.

Zago testified that he was attacked because of his wealth and "his social position in Peru within society." Zago explained that he was invited to public events at which political figures were present because he worked with "the municipality providing the bread to the schools[,]" "the Navy," and with "international" companies "like Nestle." Zago testified that "as far as [he] kn[e]w, through [his] associations, several businessmen were going through the same situation." Zago knew of one "person" who had "request[ed] asylum in Chile[] [a]nd when he returned to spend Christmas in Peru, he was assassinated."

6

The immigration judge granted Zago asylum. The immigration judge ruled that Zago had "crossed the minimum threshold to establish that this is not merely an extortion case, but that the Shining Path does in fact have the intention to persecute [Zago and his family] for a little bit more than extortion, but rather, because they were members of the business community and also because of their refusal to cooperate with them and their denouncing these acts to the authorities." The immigration judge concluded that Zago and his family "bec[a]me targets based on political opinion." The immigration judge found that Zago was a "prominent business owner[] in Lima, who had ties to the government because of [his] way of making business with particular government entities" that "was obviously well-known to the Shining Path, who singled [him] out, not only for war tax, but also . . . to make [him] an example of [the] re-strengthening movement" and Zago was "targeted" because "that would easily provide an example to other business owners." The immigration judge ruled that Zago was eligible for asylum "because of membership in a particular social group and because of also imputed political opinion for [his] refusal to cooperate with the terrorist group Shining Path." The immigration judge declined to address whether Zago was eligible for withholding of removal or relief under the Convention.

The government appealed to the Board. The government argued that Zago was not eligible for asylum because he did not prove that he was targeted for

7

criminal extortion, rather than on account of a protected ground. The government contended that Zago's membership in the business community did not qualify as a "particular social group" and that Shining Path pursued Zago, not because of his political opinion or activities, but instead to further its own political objectives. The government argued that Zago did not establish he had well-founded fear of future persecution because the government of Peru was fighting Shining Path; Zago's extended family remained in Peru unharmed; and Zago's wife and daughters had not been harmed after he left Peru.

The Board sustained the appeal by the government and ruled that Zago and his family were not entitled to asylum because "the harm they fear is not due in part to a statutorily protected ground." The Board found that Zago and his family were "targeted because of their perceived wealth and [Zago's] social position as a successful businessman" and not because of "their political opinions" or "based upon their membership in a particular social group." The Board concluded that "wealthy businessmen and their families are not the kind of group" that the Immigration Act protects, nor do they share a "common, immutable characteristic," because its members "would manifest a plethora of different lifestyles, interest, cultures and political opinions."

Zago moved the Board to reconsider. Zago argued that the Board focused improperly on his wealth; excluded evidence about his connections to the Peruvian

government; and reviewed <u>de novo</u> the decision of the immigration judge. Zago asserted that he was targeted based on a political opinion imputed by Shining Path and because of his prominence as a businessman. The Board denied Zago's motion because Zago and his family "raise[d] essentially the same arguments as were raised on appeal" and the Board "remain[ed] unpersuaded by [those] arguments."

After Zago petitioned this Court for review, the government requested that we remand the case for the Board to clarify what standard of review it applied to the findings of fact and legal conclusions of the immigration judge. We granted the motion. We vacated the order that denied Zago's motion to reconsider and "remand[ed] for reconsideration in light of the Board's scope of review under 8 CFR § 1003.1(d)(3)(i)[.]"

On remand, the Board explained that its ruling was "consistent with [its] limited scope of review." The Board stated that it reviewed the findings of fact of the immigration judge for clear error and reviewed <u>de novo</u> the decision "as to 'whether the facts demonstrate harm that rises to the level of persecution and whether the harm was inflicted "on account of" a protected ground . . . ." The Board found no error in its "previous determination which, although different from the Immigration Judge's conclusion, was nevertheless based on the facts presented

9

and represented a legal conclusion that [Zago and his family] failed to establish the requisite nexus for asylum and withholding of removal."

## II. STANDARD OF REVIEW

We review the denial of a motion to reconsider for abuse of discretion. Calle v. U.S. Att'y Gen., 504 F.3d 1324, 1328 (11th Cir. 2007).

## III. DISCUSSION

The issue before us is whether the Board abused its discretion when it denied Zago's motion to reconsider, not whether the Board erred when it sustained the appeal by the government and entered a final order of removal. An alien must petition for review of an order of removal "no[] later than 30 days after the date of the final order of removal." INA § 242(b)(1); 8 U.S.C. § 1252(b)(1). The Board ordered Zago removed on May 23, 2006 and, although Zago filed a motion to reconsider within thirty days, Zago's motion did not toll the deadline for filing a petition for review of the earlier order, see Stone v. INS, 514 U.S. 386, 405, 115 S. Ct. 1537, 1549 (1995); Dakane v. U.S. Att'y Gen., 399 F.3d 1269, 1272 n.3 (11th Cir. 2005) (per curiam). Zago did not file a petition within thirty days of the final order of removal. Zago filed his petition for review within thirty days of the order that denied his motion to reconsider.

Zago challenges the denial of his motion to reconsider on two grounds. First, Zago argues that the Board reviewed the decision of the immigration judge

10

under an incorrect standard of review. Second, Zago argues that the Board ignored evidence that Shining Path targeted him based on an imputed political opinion that he supported the Peruvian government and based on his membership in a particular social group of Peruvian businessmen. These arguments fail.

The Board did not abuse its discretion when it rejected Zago's argument that the Board had applied an erroneous standard of review. After the removal from this Court, the Board reviewed the findings of fact by the immigration judge for clear error and "questions of law, discretion, and judgment and all other issues in appeal from decisions of immigration judges de novo." 8 C.F.R. § 1003.1(d)(3). The Board explained that it had relied on the facts found by the immigration judge and reached a different legal conclusion about whether those facts established that Zago was persecuted on account of a protected ground.

The Board did not abuse its discretion when it rejected Zago's argument that the Board had ignored evidence that he had been persecuted based on an imputed political opinion. The Board was entitled to conclude that Zago was a victim of extortion. Shining Path never accused Zago of adverse political activities or demanded that he terminate government contracts or cease his affiliation with government politicians. See Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821–22 (11th Cir. 2007). Shining Path referred to Zago as a member of the "oligarchy" and as a "traitor," but these terms were interpreted by Zago and the Peruvian

11

authorities to refer to Zago's elite social status as a successful businessman, not to any political activities. This interpretation was consistent with the report of the State Department that Shining Path extorted wealthy businessmen because of their income.

The Board also did not abuse its discretion when it rejected Zago's argument that the Board ignored evidence that he had been persecuted based on his membership in a social group. We defer to the definition by the Board of "membership in a particular social group" as persons who have an immutable characteristic or common trait such as sex, color, kinship, or, in some cases, shared past experiences such as land ownership or military service. Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1196 (11th Cir. 2006) (deferring to the definition applied by the Board in Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985)). Based on this definition, the common characteristic that defines a social group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Acosta, 19 I. & N. Dec. at 233. The Board was entitled to conclude that Shining Path targeted Zago because he had access to large amounts of money, not because of any protected characteristic he shared with other Peruvian businessmen. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006) (per curiam) ("[E]vidence that . . . is consistent with . . . the petitioner's failure to

12

cooperate with guerillas . . . does not constitute evidence of persecution based on a statutorily protected ground."); Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437–38 (11th Cir. 2004) (per curiam). Zago asserted in his application and in his testimony that he was targeted because of his wealth and social interaction with government officials, not for any social welfare or political activity.

## IV. CONCLUSION

Zago's petition for review is **DENIED**.