[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15012
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 17, 2011
JOHN LEY
CLERK

Agency No. A088-341-587


ROCCO CHIRICO-ROMANZO,
ADRIANA CHIRICO IAISSO,
GIANFRANCO ANTONIO CHIRICO IAIZZO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 17, 2011)

Before BARKETT, HULL and FAY, Circuit Judges.

PER CURIAM:

Rocco Chirico-Romanzo seeks review of the Board of Immigration Appeals's ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). After review, we deny the petition for review.

## I. BACKGROUND

### A. Asylum Application

Chirico-Romanzo is a native of Venezuela and a citizen of Venezuela and Italy. In October 2003, Chirico-Romanzo, his wife and their infant son entered the United States on visitor visas with permission to remain until April 2004. Sometime in 2004, Rocco Services, Inc., Chirico-Romanzo's Florida corporation, applied for an L-1 visa, pursuant to INA § 101(a)(15)(L), 8 U.S.C. § 1101(a)(15)(L), for Chirico-Romanzo to start a new office in the United States as the company's President/Executive Manager. The L-I visa petition was denied in January 2005. Chirico-Romanzo's appeal was denied in August 2006.

On May 19, 2008, Chirico-Romanzo filed his asylum application, including his wife and son as derivative beneficiaries. Chirico-Romanzo alleged that he was persecuted and feared future persecution by the Bolivarian Circles on account of his political opinion and membership in a particular social group. Specifically,

Chirico-Romanzo claimed the Bolivarian Circles, acting on behalf of the Venezuelan government led by President Hugo Chavez, threatened and attempted to kidnap him because he worked for his father's Venezuelan construction company, Servicios y Construcciones Fiamonte, C.A., which the Bolivarian Circles wanted to take over.

In October 2009, DHS issued Notices to Appear ("NTA") charging Chirico-Romanzo, his wife and son with being removable for having overstayed their visas, which expired in April 2004. Chirico-Romanzo admitted the allegations in the NTA and conceded removability.

## B. Removal Hearing

At his removal hearing, Chirico-Romanzo testified that he was not politically active in Venezuela. Chirico-Romanzo, his brother-in-law and his mother were partners in a construction company founded by his father. Chirico-Romanzo was also the company's administrator. The company made steel and metal constructions for the oil industry and had contracts with the Venezuelan government. The company's main customer was PDVSA, a Venezuelan oil company.

Chirico-Romanzo believed "circles of people who worked for the government" threatened and harassed his family to try to stop them from doing

3

their work so that the pro-government circles could take over the company. Chirico-Romanzo said these pro-government circles were "trying to get us out of the game. They were trying to make us tired," so that his family would "abandon what we had and we would leave the industry that we were in."

Chirico-Romanzo recounted four incidents in which he was targeted. In the first incident, in 1999, masked, armed individuals broke into the company "looking for the owners" to kidnap them and collect a ransom. The kidnap attempt was unsuccessful because Chirico-Romanzo was away on business. Instead, the masked individuals robbed the company and left. Chirico-Romanzo believed they were members of the Bolivarian Circles "[b]ecause they used the same rhetoric of the president." However, the Venezuelan police report states only that a company security guard was tied up by "attackers." There is no mention of the Bolivarian Circles, a kidnap attempt or a robbery.

In 2002, after Hugo Chavez became president, the Chavez government seized PDVSA. During a national strike that caused Chirico-Romanzo's company to shut down for two months, Chirico-Romanzo received telephone threats to take the company. The callers would identify themselves as members of the Bolivarian Circles and state that "they were coming from the commander," which Chirico-Romanzo took to mean President Chavez. Also, company employees driving

4

company vehicles were assaulted and their vehicles were taken.

Sometime after the strike, the second incident occurred. Four men confronted Chirico-Romanzo as he left a bank. The men threatened to kill Chirico-Romanzo and stole the payment for Chirico-Romanzo's employees. The robbers made references to his company's government contracts and told him the robbery was "punishment for our capitalist greed."

The third and fourth incidents occurred in early 2003, just before Chirico-Romano and his family came to the United States. In the third incident, two men with guns tried to kidnap Chirico-Romanzo. Chirico-Romanzo begged them not to kill him because he had an eight-month old baby. The gunmen said that he "should think of that when [he was] doing business with the people of Venezuela" and called him "a dirty capitalist." The gun men took his belongings and left him on the street. Because it was dark, Chirico-Romanzo did not see his kidnappers well, but the kidnappers said their "commander wants our companies" and that Chirico-Romanzo would face problems if he filed a complaint. Chirico-Romanzo did file a police report. The police report states that "two unknown subject[s]" carrying firearms threatened Chirico-Romanzo with death and took his vehicle.

In the fourth incident, Chirico-Romanzo's mother-in-law received a call on her cell phone threatening to kidnap Chirico-Romanzo's son. Chirico-Romanzo

5

investigated but could not identify who placed the call.

Soon after, Chirico-Romanzo and his family left for the United States in 2003.  Chirico-Romanzo no longer has an ownership interest in the family company.  Chirico-Romanzo's mother, sister, brother-in-law, cousins, aunt and uncle all live in Venezuela.  Chirico-Romanzo's mother and brother-in-law are still partners in the family company, which still operates in Venezuela.  Neither has been harmed by the Bolivarian Circles, although his brother-in-law has received several death threats.

## C.    Country Reports

The U.S. State Department's 2008 Country Report on Human Rights Practices for Venezuela stated that: (1) government security forces did not commit any politically motivated killings or disappearances; (2) the judiciary is inefficient, sometimes corrupt and subject to political influence; (3) the government held some political prisoners, many related to a 2002 coup attempt; (4) security forces sometimes targeted the homes of opposition leaders for searches; (5) the government interfered with and harassed critical privately-held media; (6) there is official discrimination of political opposition, such as maintaining lists of individuals ineligible for government jobs; (7) Human Rights Watch has stated that government officials removed detractors from civil service jobs, "purged

6

dissident employees from the national oil company," and denied access to social programs based on political opinion; and (8) human rights organizations operating in Venezuela, especially those receiving foreign funding, reported threats, physical attacks and harassment.

The 2008 Country Report also noted that "[t]he government had not resolved any additional cases involving 19,000 PDVSA employees who were fired during and after the 2002-03 national strike, beyond those resolved in 2006," and that the government continued to deny those workers benefits and to deny registration for the oil workers' union. Further, a 2008 survey by the International Trade Union Confederation "indicated that labor conflicts related to recruitment practices in the construction and oil sectors . . . generated acts of violence ranging from physical and verbal assaults to killings." Reportedly, "42 workers, including 19 union leaders, were affected by violence." The 2008 Report stated, "According to union leaders, the government organized groups of parallel construction unions to attack and intimidate construction workers affiliated with the CTV [the Venezuelan Workers' Confederation] to gain control of lucrative construction projects," and "29 reported deaths were associated with union clashes from October 2007 through September."

Chirico-Romanzo submitted excerpts from a 2008 Human Rights Watch

7

Report, which stated, inter alia, that: (1) political discrimination and workers' rights violations occurred in the state-run oil company, PDVSA, and companies that worked with PDVSA; (2) in 2002, PDVSA fired over 18,000 employees who participated in the two-month long national strike opposing Chavez's takeover of PDVSA; (3) PDVSA "blacklisted" striking employees from future employment in the oil industry, including writing letters to its contractors warning them not to hire them and to fire employees who participated in the strikes; (4) the government indicated that all PDVSA employees needed to "support the 'Bolivarian process,'" and that some departments of the company "appeared to follow these government statements" and forced out anti-Chavez employees; and (5) "[o]fficial encouragement of political discrimination also has led companies that work with PDVSA and need to gain government contracts to engage in political discrimination," including hiring only supportors of the Chavez government.

**D.    ALJ's Decision**

Following the hearing, the IJ denied all relief.  The IJ concluded that Chirico-Romanzo's 2009 asylum application was untimely and that he had not shown extraordinary circumstances that would excuse the untimeliness. Alternatively, the IJ found that Chirico-Romanzo had not shown he was statutorily eligible for asylum.  As to his claim of past persecution in Venezuela, the IJ found

8

that Chirico-Romanzo had not shown: (1) that he had been targeted on account of an actual or imputed political opinion; or (2) that the incidents rose to the level of persecution. With regard to his future persecution claim, the IJ found that Chirico-Romanzo had not shown: (1) that he would face persecution in Italy; or (2) that he had an objectively reasonable fear of harm in Venezuela. The IJ noted that Chirico-Romanzo's "entire theory in this case" that the Bolivarian Circles targeted him because the Chavez-led government wanted to take over his family's business "seems to be somewhat implausible" because the government "could have just stopped entering into any contracts with" his family's business. Because Chirico-Romanzo had not shown he was eligible for asylum, the IJ found that he had not met the higher burden of establishing eligibility for withholding of removal.

## E.     BIA Appeal

On appeal, the BIA agreed with the IJ that Chirico-Romanzo's 2009 asylum application was time-barred and that Chirico-Romanzo had not shown statutory eligibility for withholding of removal to Venezuela. The BIA concluded that: (1) as to past persecution, the alleged threats, even in the aggregate, did not rise to the level of persecution, and the kidnapping attempt was perpetrated by unknown individuals; and (2) as to future persecution, Chirico-Romanzo did not show "the requisite objective component for the relief." The BIA also found that the IJ "gave

sound reasons" for finding that Chirico-Romanzo's claims were implausible. Chirico-Romanzo petitioned this Court for review.

## II. DISCUSSION

On appeal, Chirico-Romanzo concedes that we lack jurisdiction to review the timeliness of his asylum application, and he raises no argument as to the denial of CAT relief. Thus, we address only Chirico-Romanzo's withholding of removal claim. See Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) (noting that issues not raised in the appellant's brief are deemed abandoned).[1]

To establish eligibility for withholding of removal, an applicant must show that his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The applicant bears the burden to show that it is "more likely than not" that he has been or will be persecuted on account of one of the five protected grounds in his home country. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (hyphens omitted); 8

---

[1]Although Chirico-Romanzo included his wife and son on his application as derivative beneficiaries, withholding of removal under the INA does not provide derivative benefits. See Delgado v. U.S. Att'y Gen., 487 F.3d 855, 862 (11th Cir. 2007). Accordingly, we deny the petition for review of his wife's and son's withholding of removal claims on that basis.

C.F.R. § 208.16(b)(1)-(2).[2]

We will not reverse a finding that an alien failed to demonstrate a nexus between the alleged persecution and the alien's actual or imputed political opinion unless the evidence compels the conclusion that the alien has been or will be persecuted "because of" his political opinion. Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007).[3] To establish persecution on account of political opinion, the applicant must show that he was persecuted or fears future persecution because of his own actual or imputed political opinion, not because of his persecutor's political motives. INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S. Ct. 812, 816 (1992). For this reason, being targeted by a political group for

[2]Because the BIA adopted the IJ's reasoning as to Chirico-Romanzo's statutory eligibility for withholding of removal, we review both the IJ's and the BIA's decisions on this issue. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review the factual determination that an alien is statutorily ineligible for withholding of removal under the "highly deferential" substantial evidence test, which requires that we affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1283-84 (quotation marks omitted). We will reverse "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Mehmeti v. U.S. Att'y Gen., 572 F.3d 1196, 1199 (11th Cir. 2009) (quotation marks omitted).

[3]In addition to political persecution, Chirico-Romanzo's application asserted a claim of persecution on account of membership in a particular social group. However, Chirico-Romanzo has never identified the social group of which he claims to be a member. The IJ addressed only Chirico-Romanzo's political persecution claim, and Chirico-Romanzo did not raise his separate social group claim before the BIA. Accordingly, we lack jurisdiction to review this claim. See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250-51 (11th Cir. 2006). Furthermore, Chirico-Romanzo does not advance his social group claim in this Court. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that a petitioner abandons an issue by failing to offer argument on it).

11

refusing to cooperate or for private violence, such as extortion, does not constitute persecution on account of political opinion. See, e.g., Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821-23 (11th Cir. 2007) (extortion and threats by guerillas); Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (refusal to cooperate with guerillas).

Here, we cannot say the evidence compels the conclusion that Chirico-Romanzo suffered past persecution or has a well-founded fear of future persecution on a protected ground. Even assuming Chirico-Romanzo showed that the Bolivarian Circles were responsible for the four incidents of alleged persecution, he did not show that the four incidents happened because of Chirico-Romanzo's political opinion. Chirico-Romanzo admitted he was not politically active in Venezuela. As the 2008 Country Report and the 2008 Human Rights Watch Report indicate, the Chavez government views former PDVSA employees who participated in the 2002 strike as political opposition. As such, the Chavez government engages in political discrimination against these former employees and pressures PDVSA and its contractors to do the same. However, nothing in these reports suggests that the Chavez government or its supporters view PDVSA contractors as political opposition. Given that the Bolivarian Circles' actions in this case appear to be motivated by its own anti-capitalist beliefs, rather than any

12

political beliefs held by or imputed to Chirico-Romanzo, this case is akin to cases in which guerrillas threatened or mistreated people who refused to cooperate or to pay extortion demands.[4]

Given that Chirico-Romanzo did not show past persecution on account of his political opinion, he was not entitled to a presumption of future persecution. See Tan v. U.S. Att'y Gen, 446 F.3d 1369, 1375 (11th Cir. 2006) (explaining that an alien who shows past persecution raises a rebuttable presumption of future persecution). And, the evidence does not compel a conclusion that Chirico-Romanzo had good reason to fear he would be persecuted for his political opinion if he returned to Venezuela.[5] Indeed, Chirico-Romanzo presented no evidence that the Bolivarian Circles continue to be interested in him. Chirico-Romanzo admits he no longer holds an ownership interest in the family company. Moreover, the family members who remain in Venezuela and own and operate the company have not been harmed by the Bolivarian Circles.

Finally, we reject Chirico-Romanzo's argument that the BIA applied the

---

[4]Chirico-Romanzo has not alleged or argued a claim of economic or employment persecution.

[5]Because substantial evidence supports the finding that Chirico-Romanzo's claims, even if credited, do not show persecution or a well-founded fear of persecution on account of his political opinion, we do not address Chirico-Romanzo's other argument that the IJ failed to make a clean credibility determination when he described Chirico-Romanzo's claims as implausible.

13

incorrect legal standard for withholding of removal claims. The BIA did not apply

the one-year time limit applicable to asylum applications to Chirico-Romanzo's

withholding of removal claim, but rather evaluated that claim on the merits.

**PETITION DENIED.**