[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14847
_____

Agency No. A208-172-899

GLORIA DIAZ-RIVAS,
LILIANA SOFIA GUTIERREZ DIAZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(April 18, 2019)

Before JORDAN, GRANT, and BALDOCK,* Circuit Judges.

GRANT, Circuit Judge:

---

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Gloria Diaz-Rivas seeks review of a final order by the Board of Immigration Appeals (BIA) affirming the denial of her application for asylum and withholding of removal.[1]  Diaz-Rivas argues that the BIA erred in concluding (1) that part of her testimony was not credible and (2) that she failed to establish that she was persecuted because of her membership in a particular social group.  She also asserts that the Immigration Judge (IJ) who heard her case denied her due process and equal protection of the laws.  Because the record does not compel reversal of the BIA's factual findings and because Diaz-Rivas's constitutional challenges lack merit, we deny the petition for review.

I.

Diaz-Rivas, a native and citizen of El Salvador, arrived in the United States on May 13, 2015.  About one month later, U.S. immigration officials conducted a "credible fear interview" to assess her eligibility for asylum and withholding of removal.  The Immigration and Nationality Act (INA) requires an alien seeking asylum to establish that she was persecuted "on account of" her "race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  Similarly, an applicant for withholding of removal must

---

[1] Diaz-Rivas's daughter, Liliana Sofia Gutierrez Diaz, seeks relief as a derivative beneficiary of Diaz-Rivas's asylum application and so her claim rises or falls with Diaz-Rivas's request.  *See* 8 U.S.C. § 1158(b)(3)(A).  Her derivative claim does not encompass Diaz-Rivas's claim for withholding of removal.  *See Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 862 (11th Cir. 2007) (per curiam) (holding that "there are no derivative benefits associated with a grant of withholding of removal").  Moreover, Diaz-Rivas did not challenge the IJ's denial of her claim for relief under the Convention Against Torture and so we, like the BIA, consider that issue waived.  *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

show that her life or freedom would be threatened "because of" one of these protected grounds.  8 U.S.C. § 1231(b)(3)(A).

During the credible fear interview, Diaz-Rivas stated that she fled El Salvador because members of the gang MS-13 threatened to kill her family. According to Diaz-Rivas, the gang kidnapped and killed her brother-in-law, Fidel, for failing to pay extortion money, then threatened her family after they reported his disappearance to the police.  When the interviewing officer asked whether she feared returning to El Salvador for any other reason, Diaz-Rivas replied, "No, just what I told you.  The reason we flee from there.  They want to kill us.  There I had my life.  My home.  We weren't rich or anything, but I was happy with my life." Diaz-Rivas also asserted that her cousin sexually abused her when she was a child but confirmed that no one else in her family had ever harmed her.

Following her release from detention, Diaz-Rivas retained counsel, who she thought would file an asylum application on her behalf.  But counsel never did so, which led to an order of removal.  When immigration officials sought to deport her, Diaz-Rivas obtained new lawyers, who filed an appeal with the BIA based on ineffective assistance of counsel.  In support of that appeal, Diaz-Rivas submitted two affidavits describing a new reason that she fears returning to El Salvador. Specifically, Diaz-Rivas stated that her former partner, Jose Luis Gutierrez, forced her "to have sex with him about ten times a month over the course of twenty years."  She further stated, "I'm scared to return because Jose Luis says that I am still with him and that I must still see him" and "I am afraid I will be forced into sex with the father of my children again."  The BIA remanded Diaz-Rivas's case to

3

the Atlanta Immigration Court for further proceedings so that she could apply for relief from removal.

Four months later, Diaz-Rivas filed an application for asylum and withholding of removal. The IJ scheduled a November 16, 2016 hearing to evaluate those claims. About a month out, Diaz-Rivas moved for a continuance to secure additional records from El Salvador and retain a psychological expert, which the IJ denied. In doing so, the IJ remarked that "in these cases, I can tell you, there are a whole slew of them . . . . They have just been reopened and they are sitting here with motions to continue plenty. The case is going forward, okay?"

At the hearing, Diaz-Rivas testified that she feared returning to El Salvador because of the gang threats and the risk that Jose Luis would continue to abuse her. Following about three hours of testimony from Diaz-Rivas and an expert on Central American society, the IJ denied her claims on both grounds. Relevant to this petition, the IJ found that Diaz-Rivas's testimony was "not credible insofar as she claims that she was raped" by Jose Luis. Regarding the gang threats, the IJ determined that Diaz-Rivas failed to prove that MS-13 persecuted her on account of her membership in her family, which Diaz-Rivas argued was a "particular social group" under the INA.

Diaz-Rivas appealed to the BIA, which affirmed the IJ's decision. First, the BIA upheld the IJ's adverse credibility finding, noting that Diaz-Rivas's claims had "evolved significantly since her credible fear interview." Second, the BIA affirmed the IJ's determination that MS-13 "was not and would not be centrally motivated" by her "family ties." In the BIA's view, the evidence showed that the

4

gang threatened Diaz-Rivas and her family as "reprisal for contacting law enforcement" and would have done so "irrespective of whether the individual who contacted law enforcement was related to the subject of the report."

## II.

This Court reviews the BIA's order "as the final judgment, unless the BIA expressly adopted the IJ's decision." *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016) (per curiam) (citing *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009)). "Where the BIA agrees with the IJ's reasoning, we review the decisions of both the BIA and the IJ to the extent of the agreement." *Id.*; *see also Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001) ("Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well."). In other words, where the BIA affirms the IJ's determinations for the IJ's stated reasons, "we review the IJ's analysis as if it were the Board's." *Najjar*, 257 F.3d at 1284.

Although we review the BIA's legal conclusions de novo, *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 817 (11th Cir. 2004), its factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We thus review the BIA's findings of fact under the "highly deferential" substantial evidence test, which requires affirming those determinations so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quoting *Najjar*, 257 F.3d at 1284). In doing so, "we consider only 'whether there is substantial evidence for

5

the findings made by the BIA, *not* whether there is substantial evidence for some *other* finding that could have been, but was not, made.'" *Adefemi v. Ashcroft*, 386 F.3d 1022, 1029 (11th Cir. 2004) (en banc) (quoting *Mazariegos v. U.S. Att'y Gen.*, 241 F.3d 1320, 1324 (11th Cir. 2001)).

Given this generous standard, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1027. We cannot "'re-weigh the evidence' from scratch." *Mazariegos*, 241 F.3d at 1323 (quoting *Lorisme v. INS*, 129 F.3d 1441, 1445 (11th Cir. 1997)). Indeed, "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Adefemi*, 386 F.3d at 1027. Rather, when "the record could support or contradict the conclusion of the Board, we must affirm its decision." *Recinos v. U.S. Att'y Gen.*, 566 F.3d 965, 967 (11th Cir. 2009) (citing *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006)).

### III.

### A.

Diaz-Rivas first argues that the BIA erred in upholding the IJ's adverse credibility determination. As the BIA observed, Diaz-Rivas initially stated that, besides her cousin, "no one else in her family mistreated her" and that, apart from the gang threats, "she did not fear returning to El Salvador for any other reason." Only later did she claim that her former partner, Jose Luis, had repeatedly raped her and that she feared returning to El Salvador because he could harm her again. The BIA found it "significant" that Diaz-Rivas changed course on "an entire basis

6

for fearing return" to her home country, not just a minor detail or event. In the BIA's view, these inconsistencies supported the IJ's conclusion that Diaz-Rivas's allegations of rape were not credible.[2] As a result, she failed to establish her eligibility for asylum or withholding of removal on that basis. *See Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 967 (11th Cir. 2012) (explaining that an "adverse credibility determination coupled with a lack of corroborating evidence for a claim of persecution means that the applicant's claim fails").

Based on the entire record, we cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The INA expressly permits an IJ to base credibility findings on inconsistencies across an applicant's statements, regardless of whether they go "to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). And this Court has upheld adverse credibility findings based on inconsistencies like the one here, where the applicant's initial interview statement "was not merely a less detailed version of the facts" provided in later statements, but instead "contradicted" the applicant's hearing testimony. *Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1051 (11th Cir. 2009) (per curiam); *see also Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1232 (11th Cir. 2006) (upholding credibility determination based on "inconsistencies and discrepancies" between credible fear interview, asylum application, and hearing testimony). There is no question that Diaz-Rivas's claims raise serious allegations

---

[2] Diaz-Rivas also argues that the IJ erred in concluding that her allegations of rape were not credible because the IJ drew an erroneous distinction between rape and "force in marital relationships." But we need not consider that objection because we are reviewing the decision of the BIA, which did not rely on that reasoning and instead affirmed the IJ's credibility determination based on the inconsistencies in Diaz-Rivas's statements.

7

that warrant careful consideration.  That said, we are bound by our standard of review, and we cannot say that any reasonable adjudicator would be compelled to reach a different conclusion than the BIA.  *See D-Muhumed*, 388 F.3d at 818 (explaining that "this court may not substitute its judgment for that of the BIA with respect to credibility findings" (citing *Vasquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977))).

Diaz-Rivas contends that the BIA should not have seized on her failure to mention Jose Luis's sexual abuse during the credible fear interview because, although the INA permits an IJ to base credibility findings on any "relevant factor," the statute does not explicitly mention *omissions* of information.  8 U.S.C. § 1158(b)(1)(B)(iii).  We need not reach the merits of that statutory interpretation because Diaz-Rivas did not merely omit information; rather, she *contradicted* herself regarding the very reasons she sought asylum.  *Cf. Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1280 (11th Cir. 2009) (distinguishing between testimony that elaborates on an initial interview and testimony that "cannot be squared" with interview statements).  Although we have cautioned against faulting an applicant for not detailing every aspect of her claim during an initial interview, *id.* at 1279, there is no dispute that "the consistency between" an applicant's statements may support an adverse credibility determination.  8 U.S.C. § 1158(b)(1)(B)(iii); *see also Tang*, 578 F.3d at 1279 ("An IJ may of course consider whether there are contradictions between the airport interview and later testimony.").

At bottom, Diaz-Rivas insists that her initial failure to disclose Jose Luis's sexual abuse should not diminish her credibility because she had a good reason for

withholding that information.  According to Diaz-Rivas, she did not want to discuss the details of that abuse in front of her daughter, who attended part of the credible fear interview.  That explanation sounds reasonable.  It does not, however, *compel* a conclusion that Diaz-Rivas was credible in light of the contradiction between her statements.  Even "tenable" explanations of inconsistencies do not compel reversing credibility determinations.  *Chen*, 463 F.3d at 1233.  And taken on its own terms, her rationale still fails to explain why she declined to raise this abuse during the portion of the credible fear interview that her daughter did not attend.  *Cf. Shkambi*, 584 F.3d at 1051 (finding that applicant's "fear" of Albanian government did not adequately explain his inconsistencies given that he was assured that his testimony "would not be disclosed to the Albanian government").  Because substantial evidence supports the BIA's credibility determination, we "must affirm" that conclusion.  *Adefemi*, 386 F.3d at 1029.

### B.

Diaz-Rivas next objects to the BIA's conclusion that she was not persecuted on account of her membership in a particular social group.  In Diaz-Rivas's view, MS-13 targeted her precisely because of her relationship with her brother-in-law, Fidel.  In other words, the gang persecuted her on account of her family membership.  For its part, the BIA assumed that a family can qualify as a particular social group but determined that Diaz-Rivas's family ties did not motivate her persecution.  Instead, the evidence showed that MS-13 threatened her as "reprisal for contacting law enforcement following her in-law's disappearance" and that

9

"such reprisal efforts" would have occurred "irrespective of whether the individual who contacted law enforcement was related to the subject of the report."[3]

To be clear, an asylum applicant's protected trait "need not be the *only* motivation for the persecution." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007). If MS-13 threatened Diaz-Rivas on account of her police report *and* her membership in a particular social group, she could still qualify for relief. But where multiple motivations may be at work, the INA instructs that the protected trait must have been "at least one *central* reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

We have not construed the term "central" in any published decision, but the plain meaning of the word in ordinary usage indicates that an applicant's protected trait must have been "essential" to her persecution. American Heritage Dictionary 301 (5th ed. 2016); *see also* New Oxford American Dictionary 281 (3d ed. 2010) (defining "central" to mean, among other things, "principal or essential"). Indeed, other courts have interpreted the term "central" in this same way, including the Ninth Circuit in an opinion on which the dissent relies at length: "A 'central' reason is a reason of primary importance to the persecutors, one that is *essential* to

---

[3] As support for its conclusion, the BIA cited *Matter of L-E-A-*, 27 I. & N. Dec. 40 (BIA 2017), which held that a family can constitute a "particular social group" in certain circumstances. After the close of briefing in this appeal, the Acting Attorney General directed the BIA to refer *Matter of L-E-A-* to him for reconsideration, which "automatically stayed" that decision pending his review. 27 I. & N. Dec. 494, 494 (A.G. 2018). That stay does not preclude our resolution of this case because substantial evidence supports the BIA's conclusion that Diaz-Rivas was not persecuted *because of* her family ties—in other words, she fails to qualify for asylum and withholding of removal regardless of whether her family constitutes a "particular social group." To conclude otherwise, we would need to decide ourselves whether an applicant's family constitutes a particular social group in these circumstances—a task that the Attorney General is poised to undertake and that the dissent has not carried out.

their decision to act." *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009) (emphasis added). In other words, a motive qualifies as central "if the persecutor would not have harmed the applicant if such motive did not exist." *Id.* The BIA has also adopted that view, explaining that "an alien must demonstrate that the persecutor would not have harmed the applicant if the protected trait did not exist." *Matter of N-M-*, 25 I. & N. Dec. 526, 531 (BIA 2011) (citing *Parussimova*, 555 F.3d at 741). Even Diaz-Rivas agrees that a central reason must be an "essential" one. *See* Pet'r Reply Br. at 15 (arguing that a central reason must be an "essential (as opposed to a mere remote, non-essential reason)" for the persecution). We therefore consider whether substantial evidence supports the conclusion that Diaz-Rivas's family ties were not an *essential* reason for the gang threats.

Diaz-Rivas's own testimony suggests that MS-13 would have threatened her for reporting Fidel's disappearance whether or not she was related to him. Diaz-Rivas testified that, after the gang "disappeared" Fidel—in other words, killed him—she and other family members "looked for him" and "reported it to the police." In response, the gang "started threatening" to "disappear" the family "for looking for" Fidel. The fact that MS-13 only started threatening Diaz-Rivas after she reported Fidel's disappearance supports the inference that the gang did not target her because of her family ties. *See Rivera v. U.S. Att'y Gen.*, 487 F.3d 815, 823 (11th Cir. 2007) (finding that a family's political opinion did not motivate persecution that occurred "only after they refused to pay" a tax and "long after" the persecutors "would have imputed a political opinion to" the family). To put a finer point on it, the gang did not start threatening her until after she filed the report,

11

even though it knew about her family ties well before that. And operating, as we must, under a highly deferential standard of review, we certainly cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Nor does other evidence in the record compel the dissent's view that MS-13 would have persecuted Diaz-Rivas based on her family ties alone. *See* Dissenting Op. at 32. To the contrary, it demonstrates that the gang's threats were conditional: Diaz-Rivas stated that the "threats started after" Fidel disappeared and that the gang told her that "if we kept looking for him . . . the same thing was going to happen to us." The fact that MS-13 would have stopped persecuting Diaz-Rivas so long as she stopped her search makes plain that, at least under the record before us, her family ties were not a central reason for the threats.

The dissent points out that Diaz-Rivas stated during her credible fear interview that MS-13 members were unhappy even before she reported them to the police "because they wanted more and more rent"—that is, extortion money. Even so, that is less evidence that the gang punished Diaz-Rivas for her family membership, as opposed to her own failure to pay "rent." To the extent that the gang threatened Diaz-Rivas because of *her* refusal to pay extortion, that might show that she was "the victim of criminal activity," but it would not "constitute evidence of persecution based on a statutorily protected ground." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1258 (11th Cir. 2006) (citing *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)). In any event, the record does not compel the

12

conclusion that the gang's earlier unhappiness with the family motivated—much less centrally motivated—its subsequent threats on Diaz-Rivas's life.[4]

Indeed, Diaz-Rivas herself testified that "many people disappear in El Salvador because they make a report to the police" without suggesting that such reprisals depend on the family background of the person who made the report. So too here, with Diaz-Rivas explaining that MS-13 targeted her "because" she involved the police and threatened to kill her "for looking for" her brother-in-law—without stating that her familial connection also mattered to the gang. Her testimony is not surprising; we find it hard to conclude that kinship ties are necessary to provoke retaliation when gang members learn that someone— anyone—has reported their crimes to the police. To be sure, Diaz-Rivas may not have reported Fidel's disappearance in the first place absent their familial ties. "The issue before us," however, is the "motivation of the alleged *persecutors*" in targeting Diaz-Rivas, not the motivation of Diaz-Rivas in looking for Fidel. *Rivera*, 487 F.3d at 821 (emphasis added).

In sum, we find that substantial evidence supports the BIA's factbound conclusion that Diaz-Rivas's family ties were not a central reason for the gang threats. The dissent appears ready to reverse the BIA so long as there exists some plausible—even possible—interpretation of the record that diverges from the agency's conclusion. Our deferential mode of review, however, requires much

---

[4] The dissent also faults the BIA because certain lines of testimony were not "mentioned or discussed" in its decision. Dissenting Op. at 32. Yet we have consistently explained that the agency need not specifically address "each piece of evidence the petitioner presented." *Shkambi*, 584 F.3d at 1048 (citation omitted). And here, the BIA expressly based its nexus determination on "the record in its entirety," citing both Diaz-Rivas's and her expert's testimony.

more.  *Supra*, at 5–6.  That remains true "even if the evidence could," as the

dissent insists that it does, "support multiple conclusions."  *Adefemi*, 386 F.3d at

1029; *see also, e.g.*, *Perlera-Escobar v. Exec. Office for Immigration*, 894 F.2d

1292, 1299 (11th Cir. 1990) ("Although other inferences about the guerrillas'

motives may be drawn, it is not our task to do so as long as substantial evidence

supports the BIA's conclusion.").

C.

Diaz-Rivas also lodges two constitutional complaints about the IJ's

decision—namely, that the IJ denied her due process and equal protection of the

laws.[5]  Taking those issues in turn, we first conclude that the IJ afforded Diaz-

Rivas due process, which, in the removal context, "requires that aliens be given

notice and opportunity to be heard."  *Fernandez-Bernal*, 257 F.3d at 1310 n.8

(citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *see also Alhuay v. U.S. Att'y*

*Gen.*, 661 F.3d 534, 548 (11th Cir. 2011) (per curiam) ("Due process is satisfied

---

[5] This Court has held that, unlike "deportable" aliens, "excludable" aliens (those effectively stopped at the border) "have no constitutional rights with respect to their applications for admission, asylum, or parole."  *Jean v. Nelson*, 727 F.2d 957, 984 (11th Cir. 1984).  That said, we decided *Jean* before Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which eliminated "many of the legal distinctions between 'deportation' and 'exclusion' proceedings" and "merged those two proceedings into the more general 'removal' proceedings."  *Fernandez-Bernal v. U.S. Att'y Gen.*, 257 F.3d 1304, 1306 n.3 (11th Cir. 2001).  Because this Court has subsequently and repeatedly held that "the Fifth Amendment entitles petitioners in removal proceedings to due process of the law," without distinguishing between deportable and excludable aliens, we think that Diaz-Rivas has stated at least colorable constitutional claims, regardless of whether she might be deemed a deportable or excludable alien.  *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010) (per curiam) (citing *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007)).  We thus retain jurisdiction to consider the merits of her constitutional arguments.  *See Arias v. U.S. Att'y Gen.*, 482 F.3d 1281, 1284 n.2 (11th Cir. 2007) (explaining that this Court retains jurisdiction to review "colorable" constitutional claims, meaning ones that "have some possible validity" (quoting *Mehilli v. Gonzales*, 433 F.3d 86, 94 (1st Cir. 2005))).

only by a full and fair hearing." (quoting *Ibrahim v. INS*, 821 F.2d 1547, 1550 (11th Cir. 1987))).  Diaz-Rivas does not suggest that she lacked notice of the government's charges or was refused a hearing on the merits—indeed, the IJ allowed her (through counsel) to present evidence, including expert testimony, for about three hours.  *See Alhuay*, 661 F.3d at 549 (rejecting due process objection where the IJ gave the petitioner "ample opportunity to testify and to present evidence on her behalf").

Instead, Diaz-Rivas contends that the IJ did not give her a fair shake, insisting that he disregarded key components of her arguments and evidence.  This Court has occasionally vacated agency decisions when they were "so lacking in reasoned consideration and explanation that meaningful review was impossible." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1302 (11th Cir. 2015); *see also Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (explaining that the IJ "must 'consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted'" (quoting *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992))).  In these situations, the IJ's decision must be so deficient in reasoning that "we are unable to review" it, such as where the IJ "misstated the contents of the record," made findings "without logical explanation," and utilized reasoning "unresponsive to any argument reflected in the record." *Tan*, 446 F.3d at 1375–77.

We think that the IJ's decision steered clear of those pitfalls.  Diaz-Rivas's arguments essentially dispute the IJ's refusal to *credit* (as opposed to consider) certain evidence as probative or persuasive.  *See, e.g.*, *Sama v. U.S. Att'y Gen.*, 887

15

F.3d 1225, 1234 (11th Cir. 2018) (rejecting due process argument where the petitioner merely disputed "the weight the Board gave to different portions of the record"); *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 804 (11th Cir. 2016) ("That the BIA reached a conclusion different from that of the Petitioner regarding the import of the background evidence does not mean that the BIA's decision was not supported by reasoned consideration."). As just one example, Diaz-Rivas cites her belief that the IJ "disregarded" her expert's testimony as one of the IJ's several "misstatements of the record." Yet the record shows that the IJ considered and specifically recounted that testimony in rendering his decision. *Cf. Sama*, 887 F.3d at 1235 (noting that the agency "explicitly considered at least some of the evidence that" the petitioner argued it ignored). In fact, the IJ expressly stated that he did "not mean to ignore the testimony of" Diaz-Rivas's expert, but simply did "not find that the expert's testimony" was "sufficient for the Court" to rule in her favor. The fact that this evidence failed to carry the day does not mean that the IJ misstated or refused to consider it. *See Sama*, 887 F.3d at 1234; *Jeune*, 810 F.3d at 804.

Diaz-Rivas also advances a few more specific complaints, none of which amounts to a due process violation. She argues that the IJ failed to conduct an "individualized determination" of her claim and exhibited "bias" against Salvadoran women based on his reference to a "whole slew" of "these cases" and observation that "nobody wants to go forward" on them. The record, however, contains no support for her speculation that this remark refers to cases involving Salvadoran women (in fact, it appears that the IJ was likely referencing cases that

16

were reopened based on ineffective assistance of counsel).  Moreover, Diaz-Rivas asserts that the IJ should have granted her a continuance so that she could secure additional records from El Salvador and retain a psychological expert.  We have, however, repeatedly held that "the failure to receive relief that is purely discretionary in nature," such as a continuance, does not violate due process. *Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 (11th Cir. 2008) (quoting *Garcia v. U.S. Att'y Gen.*, 329 F.3d 1217, 1224 (11th Cir. 2003)); *see also Zafar v. U.S. Att'y Gen.*, 461 F.3d 1357, 1367 (11th Cir. 2006) (holding that petitioners' due process rights were not violated "when the IJs did not continue their removal proceedings").

## D.

Finally, Diaz-Rivas argues that the Atlanta Immigration Court (AIC) denied her equal protection because it grants asylum claims at a much lower rate on average than other Immigration Courts throughout the country.[6]  According to Diaz-Rivas, the AIC's "shockingly low asylum grant rate of only 2% compared to the average grant rate of 43% in other Immigration Courts" reflects a discriminatory intent against asylum applicants in Atlanta "relative to similarly-situated asylum claimants in other Immigration Courts throughout the country."

---

[6] We agree with the dissent that the agency could have considered an as-applied challenge insofar as Diaz-Rivas contends that a constitutional violation occurred in *her case*.  We disagree, however, that she has done so.  But we would not need to remand in any event given that this Court reviews "constitutional challenges *de novo*." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341 (11th Cir. 2003).  And we note that the BIA cannot entertain just any systemic challenge to the patterns and practices of an immigration court. *See* 8 C.F.R. § 1003.1(b)(2) (confining the BIA's appellate authority, as relevant here, to "Decisions of Immigration Judges in removal proceedings").

Notwithstanding Diaz-Rivas's concern, we cannot say that an equal protection violation occurred *in this case* based on those statistics alone.  Even if we assumed that these numbers betray a troubling approach to asylum adjudication in Atlanta generally, they do not demonstrate any discriminatory intent in denying Diaz-Rivas's claims.  Moreover, we have previously rejected similar equal protection arguments based on "differing treatment between IJs in Atlanta and those in other jurisdictions."  *Haswanee v. U.S. Att'y Gen.*, 471 F.3d 1212, 1218 (11th Cir. 2006) (per curiam); *see also Zafar*, 461 F.3d at 1367 (rejecting equal protection argument based on the practice of IJs in "other jurisdictions" compared to IJs in Atlanta). We decline to change course here.

***

In reaching these conclusions, we do not discount the threats that Diaz-Rivas has endured or the danger that she faces.  We hold only that the BIA did not err in finding that Diaz-Rivas failed to meet the requirements for asylum and withholding of removal.  And given our standard of review, we cannot reweigh the merits of that debate for ourselves.

**PETITION DENIED.**

18

JORDAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's affirmance of the adverse credibility finding concerning the abuse claim and its conclusion that Ms. Diaz-Rivas was not denied due process. After reviewing the record and the facts surrounding MS-13's persecution of Ms. Diaz-Rivas and her family, however, I conclude that the BIA erred in ruling that family ties were not at least one of the central reasons for Ms. Diaz-Rivas' persecution. Further, I disagree with the majority and the BIA concerning the resolution of Ms. Diaz-Rivas' equal protection claim. I therefore respectfully dissent in part.

## I

The majority concludes that family ties were not a central reason why MS-13 persecuted Ms. Diaz-Rivas and her relatives because, it says, MS-13 would have independently persecuted her for reporting her brother-in-law's disappearance to the authorities. In my view, this construes the "at least one central reason" standard too narrowly—in conflict with our sister circuits—and ignores the realities of a mixed-motive analysis.

## A

To interpret the "at least one central reason" standard, I begin with the text of 8 U.S.C. § 1158(b)(1)(B)(i). *See Duncan v. Walker*, 533 U.S. 167, 172 (2001). The relevant language states that "the applicant is a refugee" if he or she can "establish

19

that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant." §1158(b)(1)(B)(i) (emphasis added). The statute does not explicitly define what is or is not a central reason, but the language preceding the term "central" is instructive, and indicates that there can be more than one central reason. *See INS v. Phinpathya*, 464 U.S. 183, 189 (1984) ("[T]he legislative purpose is expressed by the ordinary meaning of the words used."). Congress' use of "one," and not "the," illustrates an intent to consider mixed motives, and the introductory phrase "at least" further clarifies that intent. *See In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 212–13 (BIA 2007) (noting that an earlier proposed version of the standard read "a central reason," but that Congress modified it to read "at least one central reason").

Although we have not had the occasion to interpret this language in a published opinion, several other courts have. For example, the Fourth Circuit has said that, based on the statute's text, an applicant's "persecution may be on account of multiple central reasons or intertwined central reasons." *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015). The Ninth Circuit has said the same thing. *See Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009) ("[P]ersecution may be caused by more than one central reason[.]"). Indeed, other circuits have reversed immigration courts for failing to consider these textual distinctions. *See Acharya v. Holder*, 761 F.3d 289, 299 (2d Cir. 2014) (concluding that the IJ "recast[ ] his inquiry as one into

20

'the central' as opposed to 'at least one central' reason for persecution"); *De Brenner v. Ashcroft*, 388 F.3d 629, 637 (8th Cir. 2004) ("[T]he BIA in this instance improperly demanded that persecution occur solely due to a protected basis. There is no such requirement in the statute[.]").

The history of the standard is also instructive. Prior to Congress passing the REAL ID Act in 2005, an applicant could demonstrate that he or she had been persecuted on account of a protected ground by showing that "the persecution was, *at least in part*, motivated by a protected ground." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006) (emphasis added). Under the "at least in part" standard, an applicant could avoid removal by showing that one of the persecutor's motives was impermissible, even if that motive was not a driving force. *See In re J-B-N-*, 24 I. & N. Dec. at 211, 214 n.9. *See also In Re S-P-*, 21 I. & N. Dec. 486, 496 (BIA 1996). A few courts have recognized that the current "at least one central reason" standard "places a more onerous burden on the asylum applicant than the 'at least in part' standard . . . previously applied." *Parussimova*, 555 F.3d at 740. *See also Shaikh v. Holder*, 702 F.3d 897, 902 (7th Cir. 2012). However, as the BIA itself recognized, the Act did not "radically alter[ ]" the prior standard. *See In re J-B-N-*, 24 I. & N. Dec. at 214. Both standards require a mixed motive analysis because "[i]n many cases, of course, persecutors may have more than one motivation." *Singh v. Mukasey*, 543 F.3d 1, 5 (1st Cir. 2008).

21

**B**

With the text of the statute and its history in mind, I turn to what a "central" reason looks like. "[One] definition of the word 'central' includes '[h]aving dominant power, influence, or control.'" *In re J-B-N-*, 24 I. & N. Dec. at 212 (second alteration in original). Some dictionaries define "central" as being "of primary importance" and note that "essential" and "principal" are synonyms. *Parussimova*, 555 F.3d at 740. Along with defining what a central reason is, some courts and the BIA have explained what a central reason is not. For example, a protected ground cannot "play a minor role" or be merely "incidental or tangential to the persecutor's motivation." *In re J-B-N-*, 24 I. & N. Dec. at 213 (quotation marks omitted). Stated differently, a central reason is not "minor" and is not "peripheral" or "superficial" to a persecutor's motivation. *See, e.g.*, *Parussimova*, 555 F.3d at 740; *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009). Notably, however, these limitations (essential, principal, not incidental, etc.) only express what it means for a reason to be "central." The preceding phrase "at least one" still requires a mixed-motive analysis when the facts of the case warrant.

In a mixed-motive case, to show that a protected ground was "at least one central reason," the applicant *is not required* to show that the protected reason was the primary or dominant reason they were persecuted. *See Marroquin-Ochoma v. Holder*, 574 F.3d 574, 577 (8th Cir. 2009) ("[T]he persecution need not be solely, or

22

even predominantly, on account of the [protected ground.]"); *Ndayshimiye v. Att'y Gen. of U.S.*, 557 F.3d 124, 129 (3d Cir. 2009) ("[A]n asylum applicant [is not required to] show that a protected ground for persecution was not 'subordinate' to any unprotected motivation."); *Parussimova*, 555 F.3d at 740 (interpreting the statute's language to not require that the applicant show the protected ground "account[ed] for 51% of the persecutors' motivation").    Requiring primacy or dominance would "recast[ ] [the] inquiry as one into 'the central' as opposed to 'at least one central' reason for persecution" and would "vitiate[ ] the possibility of a mixed motive claim." *Acharya*, 761 F.3d at 299.    Moreover, in practice, it would be nearly impossible for an applicant to show that one reason motivated the persecutor more than another.    *See Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017) ("It is unrealistic to expect that a gang would neatly explain in a note all the legally significant reasons it is targeting someone."); *Parussimova*, 555 F.3d at 742 ("[P]ersecutors are hardly 'likely to submit declarations explaining exactly what motivated them to act,' and we do not believe the Real ID Act demands such an unequivocal showing.") (quoting *Gafoor v. INS*, 231 F.3d 645, 654 (9th Cir. 2000)).

## II

In this case, the record illustrates two reasons why MS-13 targeted Ms. Diaz-Rivas and her family.    The first, in time, was the family's failure to pay "rents" to the gang.    The second was Ms. Diaz-Rivas reporting her brother-in-law's

23

disappearance to the authorities. These events transpired quickly, as the brother-in-law refused to pay MS-13 sometime in March of 2015, he was "disappeared" around March 16, 2015, and the family reported his disappearance the very next day.

The BIA, in affirming the IJ's determination that Ms. Diaz-Rivas failed to establish the required nexus between her persecution and family ties, determined that the predominant reason why MS-13 threatened Ms. Diaz-Rivas and her family was because they involved the authorities. But the BIA committed an error of law by failing to conduct a proper mixed-motive analysis. Based on my review of the record, there is no way to accurately determine which reason was more or less MS-13's motivation, and the "at least one central reason" standard does not require us— or Ms. Diaz-Rivas—to attempt such a futile endeavor. Again, Ms. Diaz-Rivas did not need to show that her kinship was MS-13's primary or dominant motivation. *See Marroquin-Ochoma*, 574 F.3d at 577; *Ndayshimiye*, 557 F.3d at 129; *Parussimova*, 555 F.3d at 740–41. Because the BIA and IJ misapplied the relevant legal standard, I would reverse and remand for application of the correct standard.

## A

Like the IJ and the BIA, the majority concludes that Ms. Diaz-Rivas' family ties were not "central," but it articulates a slightly different rationale. The majority rules that "central" means "essential," and concludes that Ms. Diaz-Rivas' family

24

ties were not essential to her persecution because MS-13 would have persecuted her regardless of her family's refusal to pay rents due to the fact she reported her brother-in-law's disappearance to the authorities. *See* Maj. Op. at 12–13. As I read its opinion, the majority essentially creates a rule that, if an unprotected ground would have been independently sufficient to instigate the applicant's persecution, then the protected reason claimed by the applicant cannot be "central." The majority cites no authorities to support such a rule, and the case it does rely on does not even interpret the "at least one central reason" standard. *See Rivera v. U.S. Att'y Gen.*, 487 F.3d 815, 821 (11th Cir. 2007).

On its face, the majority's rule replaces the phrase "at least one central" in the statute with the word "essential." *See* Maj. Op. 11. In doing so, the majority relies on the fact that Ms. Diaz-Rivas used the word "essential" in her reply brief. *Id.* But we are not bound by a party's concession in our interpretation of a statute. *See Massachusetts v. United States*, 333 U.S. 611, 624–25 & n.23 (1948). That is because "[w]e do not cede our authority to interpret statutes to the parties or their attorneys." *See Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1255 (11th Cir. 2015) (Ed Carnes, C.J., dissenting). For example, the majority's interpretation of the "at least one central reason" may not apply to a future litigant who clearly articulates that "essential" is merely a synonym for "central" and not a wholesale replacement for the standard. I agree that synonyms can be helpful in understanding

25

the terms in a statute, but if Congress intended for us to consider whether an unprotected reason would have independently caused the applicant's persecution, it could have (and, I submit, would have) used the term "essential." It did not. Just as we do not "soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome," we should not exchange Congress' chosen words when the text is actually beneficial to the litigant. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004).

Barring an applicant from protection based on the existence of an unprotected ground takes the statute's "at least one central reason" standard and recasts it into a "the central reason" standard. *See Acharya*, 761 F.3d at 299. In practice, the majority's proposal requires the applicant to show that the protected reason is the persecutor's "primary" or "dominant" reason. Both of these are improper. *See id.*; *Marroquin-Ochoma*, 574 F.3d at 577; *Ndayshimiye*, 557 F.3d at 129; *Parussimova*, 555 F.3d at 740–41.

**B**

The Fourth Circuit, in multiple cases, has considered whether family ties were "at least one central reason" for MS-13's decision to persecute an applicant. These cases include *Salgado-Sosa v. Sessions*, 882 F.3d 451, 457–59 (4th Cir. 2018); *Zavaleta-Policiano*, 873 F.3d at 247–49; *Cordova v. Holder*, 759 F.3d 332, 339–40

26

(4th Cir. 2014); and *Crespin-Valladares v. Holder*, 632 F.3d 117, 127–28 (4th Cir. 2011). *See also Hernandez-Avalos*, 784 F.3d at 949 (concerning the "Mara 18" gang). These decisions run contrary to the majority's analysis here.

For example, in *Salgado-Sosa*, 882 F.3d at 457–59, the Fourth Circuit reviewed the BIA's determination that the applicant's family ties were not a central reason for his persecution. There, the applicant and his family refused to pay MS-13's "war tax," causing the gang to attack the family. *See id.* at 454. The applicant and his stepfather reported one attack to the police and later testified against the gang. *See id.* In retaliation, the gang attacked the applicant's family home and the family fought back, injuring at least one of the gang members. *See id.* The IJ concluded, and the BIA affirmed, that the gang was motivated by the applicant refusing to pay the tax and taking action against the gang, as opposed to his family ties. *See id.* at 455–456. The Fourth Circuit reversed. Although informing the police, testifying, and fighting back against MS-13 were among the motives to persecute the applicant, the Fourth Circuit concluded that "[t]he record compels the conclusion that at least one central reason for [the applicant's] persecution is membership in his family[.]" *Id.* at 453, 457–58. In my mind, *Salgado-Sosa* is virtually indistinguishable from the facts here, and I would follow it. *See also Crespin-Valladares*, 632 F.3d at 127 (holding that the BIA erred by concluding that

27

the applicant's relation to a witness who testified against MS-13 was not a central reason because the gang was also motivated by the applicant's own testimony).

In *Hernandez-Avalos*, 784 F.3d at 947, the applicant applied for asylum after gang members in El Salvador threatened her for refusing to allow her son to join the gang. The BIA found that her relationship with her son was not a central reason the gang persecuted her, and that she was threatened "because she would not consent to her son engaging in a criminal activity." *Id.* at 949. The Fourth Circuit rejected the BIA's "excessively narrow reading" of the standard and said that it relied on "a meaningless distinction under the facts." *Id.* at 949, 950. It then concluded that the applicant satisfied the nexus requirement because her relation to her son was at least one of "*multiple central reasons* for the threats [she] received." *Id*. at 950 (emphasis added). *See also Cordova*, 759 F.3d at 339–40.

Cases applying the "at least one central reason" standard to other protected grounds similarly contradict the majority's interpretation. *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1073 (9th Cir. 2017) (en banc) (sexual orientation); *Oliva*, 807 F.3d at 58, 60–61 (moral and religious beliefs); *Castro v. Holder*, 597 F.3d 93, 100–01 (2d Cir. 2010) (political opinion); *De Brenner*, 388 F.3d at 635–37 (political opinion). In these cases, our sister circuits ruled that the existence of an unprotected ground "would not be conclusive[.]" *Castro*, 597 F.3d at 103. That is because an applicant "need only demonstrate that [her protected reason] was 'at least one central

28

reason' for the abuse; [s]he need not show it was the only reason." *Bringas-Rodriguez*, 850 F.3d at 1073.

In all of these cases, the IJ and/or BIA pointed to one or more unprotected reasons why the applicant was persecuted, and in all of these cases, our sister circuits concluded that the IJ and/or BIA interpreted the "at least one central reason" standard too narrowly. The same result, I believe, is warranted here. The majority's view is irreconcilable with the principles that a protected reason can be one of multiple central reasons and that the existence of an unprotected motive does not preclude the applicant from showing that the protected ground was also central. *See, e.g.*, *Hernandez-Avalos*, 784 F.3d at 950 (citing *Cordova*, 759 F.3d at 339).

## C

The majority, like the IJ and the BIA, goes to great lengths to assert that Ms. Diaz-Rivas' decision to report her brother-in-law's disappearance was the central reason she was persecuted. *See* Maj. Op. at 12–14. This misses the point. The text of § 1158(b)(1)(B)(i) compels us to recognize that the existence of an unprotected central reason does not defeat her claim because a second central reason may justify asylum. "When an asylum-seeker claims that a persecutor had multiple motivations, only some of which are based on protected grounds, the immigration judge cannot merely attribute the persecution to a non-protected ground." *Gomez-Rivera v.*

29

*Sessions*, 897 F.3d 995, 1000 (8th Cir. 2018) (Kelly, J., dissenting) (citing *Marroquin-Ochoma*, 574 F.3d at 577). "Rather, it remains necessary to carefully examine the record to determine whether the evidence shows that the persecution also occurred on account of a protected ground." *De Brenner*, 388 F.3d at 636.

There is some support for considering whether a particular motive was an independently sufficient reason, but only as applied to the protected reason claimed by the applicant—not to the unprotected one. In *Parussimova*, 555 F.3d at 741, the Ninth Circuit ruled that a reason is central if (a) "the persecutor would not have harmed the applicant if such motive did not exist," *or* (b) "that motive, standing alone, would have led the persecutor to harm the applicant." The majority cites only the initial portion of the Ninth Circuit's disjunctive standard, reasoning that MS-13 would have still retaliated against Ms. Diaz-Rivas for her reporting her brother-in-law's disappearance absent her family ties, but it ignores the second. *See* Maj. Op. at 11. In addition to not being faithful to what *Parussimova* held, the majority's approach fails both in practice and in theory.

First, MS-13 would not have targeted Ms. Diaz-Rivas, for either reason, absent her family ties because she would not have reported her brother-in-law missing absent those family ties. Take *Temu v. Holder*, 740 F.3d 887, 891–92 (4th Cir. 2014), where the BIA had concluded that the applicant was beaten not due to his mental illness, but as a result of erratic behavior caused by his mental illness.

The Fourth Circuit reversed, saying that it "struggle[d] to see how a rational factfinder" could reach that conclusion, and that the BIA's reasoning "demand[ed] logical acrobatics." *Id.* at 892. Citing Ms. Diaz-Rivas' decision to report her brother-in-law's disappearance, while discounting the causal relationship between her kinship and that decision, takes an "overly restrictive view of [Ms. Diaz-Rivas'] case." *Oliva*, 807 F.3d at 59 ("A close examination of the record illuminates the inextricable relationship between Oliva's membership in his proposed social groups and his refusal to pay rent."). *See also De Brenner*, 388 F.3d at 637 (highlighting the BIA's failure to acknowledge the causal relationship between the protected ground and the unprotected ground); *Hernandez-Avalos*, 784 F.3d at 950 (same).

Second, the majority fails to consider evidence in the record when it suggests that Ms. Diaz-Rivas never "stat[ed] that her familial connection also mattered to the gang." *See* Maj. Op. at 14. During her credible fear interview, Ms. Diaz-Rivas stated that she was being persecuted by MS-13 based on her family ties before she went to the authorities. Specifically, the interviewer asked Ms. Diaz-Rivas whether MS-13 "became upset with your family after you asked for protection from the military." Ms. Diaz-Rivas responded: "Yes." The interviewer then clarified by asking: "Was [MS-13] upset with your family once they found out that you had contacted the family [sic] or were they unhappy with you even before that?" Ms. Diaz-Rivas responded: "No, they already were [mad] because they wanted more and

31

more rent."   This testimony is supported by the undisputed fact that MS-13 "disappeared" Ms. Diaz-Rivas' brother-in-law for refusing to pay rents before there was any motive to retaliate against the family for involving the authorities.  I note that Ms. Diaz-Rivas also called an expert witness to testify that her family's refusal to pay rents, apart from going to the authorities, put her at risk of persecution.  *See W.G.A. v. Sessions*, 900 F.3d 957, 966 (7th Cir. 2018) (citing the "timing of the persecution" and expert reports to conclude that the applicant met the nexus requirement).  This evidence strongly suggests that "[Ms. Diaz-Rivas' family ties], standing alone, would have led [MS-13] to harm [her]."  *Parussimova*, 555 F.3d at 741.

Ms. Diaz-Rivas' statements and expert testimony, to my knowledge, are the only evidence in the record as to whether Ms. Diaz-Rivas would have been persecuted by MS-13 based only on her family ties.  But that evidence is not mentioned or discussed, in that context, by the IJ or the BIA.  *Compare Zavaleta-Policiano*, 873 F.3d at 248–49 (concluding that the BIA failed to address the applicant's statement that MS–13 started threatening her immediately after her father fled to Mexico), *with Gomez-Garcia v. Sessions*, 861 F.3d 730, 734 (8th Cir. 2017) (affirming the BIA's conclusion that the applicant's political affiliation was not central because "[t]here [was] no evidence in the record that MS-13 threatened [the applicants] before they reported [the gang's] burglary").

32

As the majority points out, we defer to the BIA's interpretation of the facts, even if our own interpretation would support a different conclusion. We do not, however, defer to the agency's determination that certain testimony did not warrant consideration. This is especially true if that testimony is the evidence in the record that the applicant's alleged reason was central to her persecution. *See W.G.A.*, 900 F.3d at 967; *Zavaleta-Policiano*, 873 F.3d at 248–49. It is our responsibility to "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009).

I also disagree with the majority's repeated claim that, because MS-13 threatened Ms. Diaz-Rivas after she reported the disappearance, we can necessarily infer that that is the reason that MS-13 persecuted her. *See* Maj. Op. at 12–13. With our standard of review in mind, the IJ and the BIA did not cite the fact that MS-13 only threatened Ms. Diaz-Rivas after she reported her brother-in-law missing to conclude she did not meet the nexus requirement. Although the IJ and BIA noted the sequence of events leading to Ms. Diaz-Rivas' claims, the majority now seizes on this undisputed chronological fact to support its new conclusion that Ms. Diaz-Rivas going to the authorities was the only central reason she was persecuted.

Moreover, the short timing between these events makes it impossible to conclude that MS-13 was not also motivated by her family's refusal to pay rents. In early March of 2015, Ms. Diaz-Rivas' brother-in-law refused to pay rents, causing

the gang to quickly threaten and disappear him, and Ms. Diaz-Rivas reported his disappearance the very next day.  By comparison, the majority cites *Rivera*, 487 F.3d at 823, for its timing argument, but in that case the persecution occurred "several years . . . after [the persecutor] would have imputed [the applicant's] political opinion."  And to the extent that the majority points to Ms. Diaz-Rivas' "own failure to pay 'rent'" as another reason why she was persecuted, that argument contradicts the record.  *See* Maj. Op. at 13.  The IJ's order and Ms. Diaz-Rivas' testimony make clear that Ms. Diaz-Rivas' brother-in-law, the patriarch of the family, refused to pay rents to MS-13, and Ms. Diaz-Rivas alleges that she was persecuted because of her family's refusal to pay rents.  *See* A000387, A000391 ("In this case, the respondent was never asked to pay any extortion. The demand was made to Felix, who is respondent's brother-in-law.").  *See also* A000089, A000434.

For these reasons, I would hold that the BIA's determination—that "[t]here is no indication [that MS–13] had an animus against [Ms. Diaz-Rivas] and her family members based on their biological ties, historical status, or other features unique to the family unit"—misapplies the "at least one central reason" standard and is not based on substantial evidence.  I would therefore reverse the BIA's determination that Ms. Diaz-Rivas' family ties were not at least one central reason for her

34

persecution and remand the case for the BIA to determine whether her family unit is a "particular social group" under the statute.[1]

### III

Ms. Diaz-Rivas also contends that the Atlanta immigration court treats asylum claims dissimilarly compared to immigration courts around the country, in violation of her equal protection rights under the Fifth Amendment.  Ms. Diaz-Rivas raised the same equal protection claim before the BIA, but the BIA dismissed it, stating that it "lack[ed] the authority to consider [it]."  The BIA cited *Matter of C-*, 20 I. & N. Dec. 529, 532 (1992), where it ruled that an IJ and the BIA "lack jurisdiction to rule upon the constitutionality of the [Immigration and Nationality] Act and the regulations."  *See also Johnson v. Robinson*, 415 U.S. 361, 368 (1974) (noting "the principle that adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies") (alteration omitted).

---

[1] The majority notes that I do not resolve whether Ms. Diaz-Rivas' family constitutes a "particular social group."  *See* Maj. Op. at 10 n.3.  It seems to me that this is the correct approach.  Like other circuits that have faced this issue, I would remand it to the BIA.  *See Oliva*, 807 F.3d at 62; *Flores-Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015); *Vumi v. Gonzales*, 502 F.3d 150, 155 (2d Cir. 2007) (collecting cases where the BIA addressed whether family was a particular social group).  In any event, "every circuit to have considered the question has held that family ties can provide a basis for asylum."  *Crespin–Valladares*, 632 F.3d at 125.  *See also Matter of L-E-A-*, 27 I. & N. Dec. 40, 43 (BIA 2017) (citing cases from the First, Second, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits).  So, if the majority is looking for legal guidance on this issue, there is plenty of it.

The prohibition on Article I tribunals adjudicating the constitutionality of a congressional enactment does not bar consideration of Ms. Diaz-Rivas' equal protection claim.    Ms. Diaz-Rivas does not argue that a federal law is unconstitutional, but rather that a particular immigration court is unconstitutionally discriminating against asylum applicants in the way that it applies a federal law.  *See McGrath v. Weinberger*, 541 F.2d 249, 251 (10th Cir. 1976) ("A fundamental distinction must be recognized between constitutional applicability of legislation to particular facts and constitutionality of the legislation . . . . We commit to administrative agencies the power to determine constitutional applicability, but we do not commit to administrative agencies the power to determine constitutionality of legislation.") (quoting 3 K. Davis, Administrative Law Treatise § 20.04, at 74 (1958)).  *See also Babcock & Wilcox Co. v. Marshall*, 610 F.2d 1128, 1136, 1139 (3d Cir. 1979) (concluding that an Article I review commission had jurisdiction to consider a motion to suppress under the Fourth Amendment "not by reviewing the constitutionality of its statute but by interpreting the statute and by applying constitutional principles to specific facts").

Based on my understanding of the relevant law, there is no general prohibition on the BIA considering constitutional issues, apart from constitutional challenges to particular statutes which would raise separation of powers concerns.  In fact, the BIA has ruled on similar constitutional challenges in the past.  *See Matter of Awadh*, 15

36

I. & N. Dec. 775, 777 (BIA 1976) (ruling on the respondent's claim that an IJ enforced a statute discriminatorily, but stating that it lacked jurisdiction to consider the constitutionality of the same statute). And other BIA opinions suggest that it has jurisdiction to consider some equal protection claims. *See In Re Salazar-Regino*, 23 I. & N. Dec. 223, 231–32 (BIA 2002); *In Re Delia Lazarte-Valverd*, 21 I. & N. Dec. 214, 219–21 (BIA 1996) (Schmidt, Chairman, concurring); *Matter of Moreira*, 17 I. & N. Dec. 370, 373 (BIA 1980); *Matter of Silva*, 16 I. & N. Dec. 26, 30 (BIA 1976). *See also Matter of Gutierrez*, 16 I. & N. Dec. 226, 227 (BIA 1977) (considering a Sixth Amendment claim).

In any event, we have jurisdiction to review constitutional claims raised during immigration proceedings. *See* 8 U.S.C. § 1252(a)(2)(D) (allowing the appropriate court of appeals to "review [ ] constitutional claims or questions of law raised upon a petition for review"); *Moore v. Ashcroft*, 251 F.3d 919, 923–24 (11th Cir. 2001) (considering an equal protection claim on appeal from the BIA). On appeal, Ms. Diaz-Rivas requests that we remand her asylum claims to the immigration court in San Francisco, California, where her attorneys are located. Although I do not believe we have ordered or encouraged the BIA to remand a case to another immigration court, at least one court has afforded similar relief. *See Floroiu v. Gonzalez*, 481 F.3d 970, 976 (7th Cir. 2007) (per curiam) ("strongly encourag[ing] the BIA to assign the [applicants'] case to a different judge on

37

remand"); 28 U.S.C. § 2106 (granting appellate courts the power to "require such further proceedings to be had as may be just under the circumstances").[2]

The due-process clause of the Fifth Amendment contains an implied equal protection component that prevents federal government officials from acting with discriminatory animus. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). "The constitutional guarantee of equal protection under the law has been held applicable to aliens as well as citizens for over a century." *Yeung v. I.N.S.*, 76 F.3d 337, 339 (11th Cir. 1995), *as modified on reh'g* (11th Cir. 1996) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). *See also Plyler v. Doe*, 457 U.S. 202, 210 (1982)

---

[2] Another avenue for relief may be for Ms. Diaz-Rivas to file an action in an appropriate federal district court. For example, 5 U.S.C. § 702—a provision of the Administrative Procedure Act— provides that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof, and [a]n action in a court of the United States seeking relief other than money damages and stating a claim" is not barred by sovereign immunity. A separate provision of the APA provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity[.]" § 706(2)(B). District courts have considered similar constitutional claims as violations of these provisions. *See Stevens v. Holder*, 950 F. Supp. 2d 1282, 1290–91 (N.D. Ga. 2013) (concluding that the plaintiff stated an equal protection claim based on an immigration judge excluding the plaintiff from certain hearings). *See also CASA de Md., Inc. v. Trump*, — F. Supp. 3d —, 2018 WL 6192367, at *1 (D. Md. Nov. 28, 2018) (claim that the government discriminatorily altered Temporary Protected Status designations, in violation of equal protection and the APA); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1092 (N.D. Cal. 2018) (same); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 414 (D. Mass. 2018) (same). The possible existence of another avenue for relief, however, does not foreclose Ms. Diaz-Rivas' current equal protection claim. In *Babcock & Wilcox Co.*, 610 F.2d at 1136, for example, a party argued that an Article III court, as opposed to an Article I review commission, could better develop the factual record for a Fourth Amendment challenge to a search warrant. The Third Circuit disagreed, stating that the Article I commission could "consider motions to suppress evidence without acting beyond its jurisdiction." *Id.* at 1139.

("[W]e have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."). In this context, the Fifth Amendment protects an asylum applicant from "be[ing] intentionally treated differently from others similarly situated [when] there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

The majority concludes that Ms. Diaz-Rivas' equal protection claim is foreclosed by binding precedent and that she failed to present evidence of discriminatory intent. I strongly disagree on both grounds: the precedent does not govern, and the evidence is more than sufficient.

First, the majority mistakenly relies on two published cases in which we have denied equal protection claims alleging that the Atlanta immigration court treated asylum applicants dissimilarly compared to other immigration courts. *See Haswanee v. U.S. Att'y Gen.*, 471 F.3d 1212, 1218–19 (11th Cir. 2006); *Zafar v. U.S. Att'y Gen.*, 461 F.3d 1357, 1367 (11th Cir. 2006). Those cases do not control. In *Zafar*, 461 F.3d at 1367, we affirmed the dismissal of the petitioner's claim that the Atlanta immigration court failed to administratively close certain immigration proceedings, when other immigration courts routinely did. We reasoned that the petitioner cited no authority to establish an equal protection violation and that there was "no support in the record" for his argument. *Id.* A year later, in *Haswannee*,

471 F.3d at 1218–19, we rejected an almost identical claim for the same reasons, citing our holding in *Zafar*.

Unlike the petitioners in *Haswanee* and *Zafar*, Ms. Diaz-Rivas has cited authority, outlined the relevant legal framework, and presented evidence to establish her equal protection claim. She alleged that (a) asylum applicants are treated differently at the Atlanta immigration court compared to immigration courts in other cities, and (b) the difference in treatment is for the purpose of discrimination. Ms. Diaz-Rivas then presented statistics showing that, from 2014 through 2016, the Atlanta immigration court only granted 2% of asylum claims while, over the same three-year period, immigration courts around the U.S. collectively granted 46% of asylum claims. These statistics did not exist when we rejected different (and conclusory) claims in *Haswannee*, 471 F.3d at 1218–19, and *Zafar*, 461 F.3d at 1367. That, by itself, makes *Haswanee* and *Zafar* distinguishable.

Second, Ms. Diaz-Rivas' statistics constitute probative evidence of disparate treatment and discriminatory intent. *See McCleskey v. Kemp*, 481 U.S. 279, 297–98 (1987); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977). "Of course, statistics do not tell the whole story." *United States v. City of Miami, Fla.*, 614 F.2d 1322, 1339 (5th Cir. 1980). "Without such a subjective look into the minds of the decisionmakers, the deceptively objective numbers [may] afford at best an incomplete picture." *Harris v. Alabama*, 513 U.S. 504, 513 (1995).

But "while statistics alone usually cannot establish intentional discrimination, under certain limited circumstances they might." *Spencer v. Zant*, 715 F.2d 1562, 1581 (11th Cir. 1983). *See also Smith v. Balkcom*, 671 F.2d 858, 859 (5th Cir. 1982). "Sometimes a clear pattern, unexplainable on grounds other than [discrimination], emerges from the effect of the [government] action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266. In those cases, statistics showing discriminatory treatment can be "a telltale sign of purposeful discrimination." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 n.20 (1977).

In my view, Ms. Diaz-Rivas' statistics—showing that from 2014 through 2016 asylum applicants outside of Atlanta's immigration court were approximately 23 times more likely to succeed than asylum applicants in Atlanta—are disquieting and merit further inquiry by the BIA. *See City of Miami*, 614 F.2d at 1339. If these statistics pertained to a federal district court, the Administrative Office would begin an investigation in a heartbeat.

The government may well be able to explain why asylum applicants so rarely succeed in Atlanta, and, because undocumented immigrants are not a suspect class, any disparate treatment "[is] subject to minimal scrutiny under the rational basis standard of review." *Yeung*, 76 F.3d at 339. At this stage, however, I am not aware of a convincing basis to explain the disparity that Ms. Diaz-Rivas presents, and the

41

government has not offered one.  At the very least, these troubling statistics "indicate plainly enough that this Court should not accept," *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 333 (1942) (Frankfurter, J., dissenting), the government's conclusory argument that this disparity merely results from "the inherent human biases of all judges."  Appellee's Br. at 36.  I add that, even if the government's unsupported suggestion has a hint of truth, the situation remains deeply troubling, as it would appear that the immigration judges in Atlanta are inherently biased (the government's phrasing) against asylum applicants in the same way.

On remand, I would order the BIA to consider the merits of Ms. Diaz-Rivas' equal protection claim or further justify its conclusion that it lacks the jurisdiction to do so.  To do otherwise is to ignore the very real possibility that "[a]ll is not well" in the Atlanta immigration court.  William Shakespeare, Hamlet, Act I, Scene 2, Line 254 (1601).

## IV

With respect, I dissent from the majority's interpretation of the "at least one central reason" standard and its resolution of Ms. Diaz-Rivas' equal protection claim.

42